## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WILLIAM "JACK" BAXTER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 11-2133 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiffs bring this action under the Foreign Sovereign Immunities Act ("FSIA") against the Islamic Republic of Iran and the Iranian Ministry of Information and Security ("MOIS"). They seek damages for injuries suffered as a result of ten terrorist attacks committed between December 2001 and September 2004. Pending before the Court is plaintiffs' motion for default judgment as to liability. ECF No. 30. For the reasons that follow, the Court will grant plaintiffs' motion and appoint a special master to receive all other evidence necessary to determine each plaintiff's entitlement to damages.

## I. PROCEDURAL HISTORY

Plaintiffs filed their complaint on November 30, 2011, pleading causes of action against Iran and MOIS. Compl., ECF No. 1.[1] Their causes of action and the jurisdiction of this Court are premised on section 1605A of the FSIA. Iran and MOIS were served with process on September

---

[1] Plaintiffs' complaint also pleads causes of action against the Syrian Arab Republic and Syrian Air Force Intelligence ("SAFI"). Because plaintiffs had been unable to confirm service of process on these two Syrian defendants and plaintiffs' claims against the Iranian defendants were ripe for consideration on the merits—and in the interest of bringing an expeditious conclusion to this litigation—the Court severed plaintiffs' claims against Syria and SAFI on May 3, 2018. ECF No. 31. Those claims now form the basis of a separate suit before this Court, *Baxter v. Syrian Arab Republic*, Civil Action No. 18-1078 (RCL). All references to "defendants" in this opinion refer only to Iran and MOIS.

16, 2012.  ECF No. 15.  Their answer was due November 15, 2012.  Defendants made no response

and have yet to appear in this case.  The Clerk of the Court entered default against defendants on

July 14, 2015.  ECF No. 26.  Plaintiffs have now moved for entry of default judgment against

defendants as to liability.  Pls.' Mot. Def. J. 5, ECF No. 30.

## II.  FINDINGS OF FACT

Before determining whether defendants should have a default judgment entered against

them, the Court must consider evidence and make findings of fact with respect to plaintiffs'

allegations.  This is because section 1608(e) of the FSIA requires that no default judgment shall

be entered against a foreign state or its political subdivision except upon "evidence satisfactory to

the court."  28 U.S.C. § 1608(e).  The Court, therefore, may not "simply accept a complaint's

unsupported allegations as true."  *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171

(D.D.C. 2010).  Courts may rely on uncontroverted factual allegations that are supported by

affidavits.  *Id.*  Also, courts may take judicial notice of prior related proceedings in cases before

the same court.  *Id.*  Before the Court sets out its findings of fact, the basis for accepting this latter

form of evidence warrants greater elaboration.

### A.  Judicial Notice of Related Cases

A court may "take judicial notice of, and give effect to, its own records in another but

interrelated proceeding . . . ."  *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 73 (D.D.C. 2014)

(quoting *Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938) (internal quotation marks

omitted)).  This is in keeping with Federal Rule of Evidence 201(b), which allows a court to

"judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately

and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R.

Evid. 201(b).  In light of this authority and the numerous FSIA cases in recent years giving rise to

nearly identical factual and legal issues, this Court and others in this District have frequently taken judicial notice of earlier, related cases arising under the state-sponsored terrorism exception to foreign sovereign immunity. *See, e.g.*, *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 115 (D.D.C. 2012) (citing cases).

But plaintiffs have asked the Court to take judicial notice of the factual record and the jury's factual determinations in the *Arab Bank* case, which went to trial in the Eastern District of New York before Judge Brian M. Cogan. Pls.' Mot. Def. J. 16 (citing Verdict Form, *Linde v. Arab Bank, PLC*, 04-cv-2799 (BMC) (E.D.N.Y. Sept. 22, 2014), ECF No. 1099). The jury ruled in favor of the *Arab Bank* plaintiffs and found Hamas was responsible for all twenty-four terrorist attacks in question. Verdict Form, *Linde v. Arab Bank, PLC*, 04-cv-2799 (BMC) (E.D.N.Y. Sept. 22, 2014), ECF No. 1099. Among those twenty-four attacks were the ten at issue in the present case. *See id.* Arab Bank challenged the jury's findings in two of the attacks—the Bus No. 19 bombing and the mortar attack on Neve Dekalim (which are at issue in this case)—in a Rule 50 post-trial motion. *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 330–31 (E.D.N.Y. 2015). Judge Cogan agreed with Arab Bank and found that there was insufficient evidence to establish Hamas' culpability for those two attacks. *Id.* The Second Circuit vacated the district court opinion on different grounds in *Linde v. Arab Bank, PLC*, 882 F.3d 314, 332–33 (2d Cir. 2018), so the plaintiffs' motion for reconsideration was deemed moot. Pls.' Mot. Def. J. 10 n.15. And so, plaintiffs here ask the Court to find Hamas culpable for all ten attacks in light of the jury's verdict in *Arab Bank* and newly presented evidence. Pls.' Mot. Def. J. 7.

Although *Arab Bank* was not heard in this District, the Court may still take judicial notice of its factual record and the jury's findings of fact. *Akers v. Watts*, 589 F. Supp. 2d 12, 15 (D.D.C. 2008) ("The Court takes judicial notice of the records of this Court and of other federal courts.");

*cf. SEIU Nat'l Indus. Pension Fund v. Liberty House Nursing Home of Jersey City*, 232 F. Supp. 3d 69, 78 (D.D.C. 2017) (taking judicial notice of adjudicated facts from a New Jersey appellate court decision arising from the same events).  Rule 201(b) permits courts to take judicial notice of facts that are "generally known within the trial court's territorial jurisdiction[] *or* [facts that] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b) (emphasis added).  Plaintiffs' sources of information were admitted into evidence during the *Arab Bank* trial, which was an adversarial proceeding subject to the Federal Rules of Evidence.  Pls.' Mot. Def. J. 1.  Furthermore, Drs. Matthew Levitt and Ronni Shaked were permitted to testify as expert witnesses at trial as well.[2]  *See Linde*, 97 F. Supp. 3d at 300–02.  The Court sees no reason to doubt the accuracy or reliability of the evidence presented at the *Arab Bank* trial.

The Court may not simply adopt previous factual findings without scrutiny because factual findings "represent merely a court's probabilistic determination as to what happened, rather than a first-hand account of the actual events."  *Fain*, 856 F. Supp. 2d at 116.  As such, courts have concluded that findings of fact are generally considered hearsay, not subject to an enumerated exception to the prohibition on hearsay evidence in the federal rules.  *Rimkus*, 750 F. Supp. 2d at 172.  This does not mean, however, that courts in later, related FSIA proceedings are given the "onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack."  *Id.*  Instead, courts adjudicating related FSIA cases may "rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them."  *Id.*  As stated above, the records of this Court in related proceedings are not subject to reasonable dispute.  *See Opati*, 60 F.

---

[2] This Court is also satisfied with both witnesses' impressive credentials and knowledge of the relevant subject matter. *See* Pls.' Mot. Def. J. Ex. B, ECF No. 30-2; Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1, ECF No. 32-1.

Supp. 3d at 73.  Thus, the type and substance of evidence previously presented to this Court in prior proceedings may be judicially noticed in the process of reaching findings of fact in this case.

### B.  The Attacks

The Court asked plaintiffs to submit proposed findings of fact and conclusions of law with respect to eight of the terrorist attacks in the complaint.[3]  The final two attacks were the subject of the July 18, 2019 evidentiary hearing, which was scheduled at the Court's request.  The Court is satisfied with the evidence presented for the first eight attacks and is prepared to take judicial notice of Hamas' responsibility for them.   After reviewing Dr. Shaked's evidentiary hearing testimony and plaintiffs' additional evidence, the Court will also find Hamas responsible for the final two attacks.

### 1.  April 30, 2003 Bombing of Mike's Place

On April 30, 2003, two terrorists—Asif Muhammad Hanif and Omar Khan Sharif— attempted to detonate two bombs at a Tel Aviv Pub (Mike's Place).  Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-A at 2, ECF No. 32-2.  Hanif detonated his bomb while Sharif waited to attempt to detonate his own bomb once the emergency services arrived.  *Id.*  Three people were killed and more than fifty were injured, including Jack Baxter.  *Id.*  Fortunately, Sharif's bomb malfunctioned and it never exploded.  *Id.*

Plaintiffs point to ample evidence on the record demonstrating Hamas' culpability for the attack.

> (1) Hamas assumed responsibility for the perpetration of the attack, publicized a tape which had been recorded before the attack by the perpetrators, published reports and notices of the attack which gave details of the attack, and published the wills of the two perpetrators; (2) there are photographs taken before the attack and published by Hamas of the two perpetrators wearing Hamas bandanas which identifies them as being members of Hamas; (3) the wills of the perpetrators

---

[3] The original complaint contained causes of action based on eleven attacks, but Nathaniel Bluth voluntarily dismissed his case against defendants on June 12, 2019.  Notice of Voluntary Dismissal, ECF No. 34.

identify themselves to be members of Hamas; and (4) official documents from the Government of Israel identify Hamas as having carried out the suicide bombing at Mike's Place.

Proposed Findings of Fact 8, ECF No. 39 (internal citations omitted); *see* Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-A at 2–6.  These findings led Drs. Shaked and Levitt to credibly conclude that Hamas operatives committed the Mike's Place bombing.  Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-A at 6; Pls.' Mot. Def. J. Ex. A at 23, ECF No. 30-2.

Accordingly, the Court will take judicial notice of the jury's factual determination in *Arab Bank* that Hamas is responsible for the Mike's Place bombing.

### 2. September 9, 2003 Bombing of Café Hillel in Jerusalem

On September 9, 2003, Ramez Abu Salim entered Café Hillel and blew himself up.  Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-B at 2, ECF No. 32-3.  David and Naava Applebaum were among the seven people killed in the attack.  Suppl. Mem. Supp. Pls.' Mot. Def. J. 7.  Plaintiffs point to ample evidence on the record demonstrating Hamas' culpability for the attack.

> (1) Hamas assumed responsibility by publishing reports and announcements taking credit for the perpetration of the attack; (2) Hamas published posters with the bomber's picture with the Hamas emblem next to him; (3) Hamas put photographs of the bomber on its official website; (4) Hamas published the will of the bomber; (5) official documents from the Government of Israel identify Hamas as having carried out the suicide bombing at Café Hillel; and (6) during judicial proceedings of co-conspirators of the perpetrators of the suicide bombing, the co-conspirators, who were found to be members of Hamas, confessed to having given instructions to the perpetrators of the suicide bombing to carry out the attack.

Proposed Findings of Fact 9 (internal citations omitted); *see* Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-B at 2–8.  These findings led Drs. Shaked and Levitt to credibly conclude that Hamas operatives committed the Café Hillel bombing.  Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-B at 12; Pls.' Mot. Def. J. Ex. A at 24.

Accordingly, the Court will take judicial notice of the jury's factual determination in *Arab Bank* that Hamas is responsible for the Café Hillel bombing.

### 3. June 11, 2003 Bombing of Bus No. 14A

On June 11, 2003, Abd el-Mu'ati Shabana, dressed as an ultra-Orthodox Jew, boarded bus No. 14A in Jerusalem and blew himself up. Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-D at 2, ECF No. 32-5. Seventeen people were killed, including Bertin Tita, and more than 100 people were wounded, including Ron Cantrall and Ariela Friermark. *Id.* Plaintiffs point to ample evidence on the record demonstrating Hamas' culpability for the attack.

> (1) Hamas immediately published an announcement on its website which assumed responsibility for the attack and stated that the bombing had been carried out by the terrorist on behalf of Hamas; (2) there are published photographs which show that the bomber was a member of Hamas; (3) the suicide bomber's will states that he is carrying out the bombing in the name of Hamas; (4) other documents published by Hamas praise the bomber and give details of the attack; (5) official documents from the Government of Israel identify Hamas and a Hamas cell which the suicide bomber was a member of as having carried out the Bus No. 14A Bombing.

Proposed Findings of Fact 10–11 (internal citations omitted); *see* Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-D at 2–7. These findings led Drs. Shaked and Levitt to credibly conclude that Hamas operatives committed the Bus No. 14A bombing. Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-D at 8; Pls.' Mot. Def. J. Ex. A at 23.

Accordingly, the Court will take judicial notice of the jury's factual determination in *Arab Bank* that Hamas is responsible for the Bus No. 14A bombing.

### 4. December 1, 2001 Bombing of Ben Yehuda Street

On December 1, 2001, two suicide bombers—Osama Mahmud Eid Behar and Nabil Mahmud Jamil Halabiya—blew themselves up on Ben Yehuda Street in Jerusalem. Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-E at 2–3, ECF No. 32-6. Eleven people were killed and more than 188 people were injured, including Averham Grossman, Joseph Leifer, Devorah Chechanow

Leifer, and Obadiah Waxler. *Id.* at 2.  Plaintiffs point to ample evidence on the record

demonstrating Hamas' culpability for the attack.

> (1) Hamas published an official announcement both in print and on its website
> assuming responsibility for the bombing and stated that the bombing had been
> carried out by the terrorist on behalf of Hamas; (2) pictures of the bombers appear
> on the Hamas website and identify the bombers as having carried out the December
> 1, 2001 Ben Yehuda Bombing; (3) other documents published by Hamas praise the
> bombers and give details of the attack; and (4) official documents from the
> Government of Israel identify Hamas as having carried out the December 1, 2001
> Ben Yehuda Bombing, and Hamas operatives as co-conspirators who both ordered
> the bombing and built the bombs that were used by the suicide bombers for the
> December 1, 2001 Ben Yehuda Bombing.

Proposed Findings of Fact 11–12 (internal citations omitted); *see* Suppl. Mem. Supp. Pls.' Mot.

Def. J. Ex. 1-E at 3–12.  These findings led Drs. Shaked and Levitt to credibly conclude that Hamas

operatives committed the Ben Yehuda Street bombing.  Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex.

1-E at 12–13; Pls.' Mot. Def. J. Ex. A at 21.

Accordingly, the Court will take judicial notice of the jury's factual determination in *Arab

Bank* that Hamas is responsible for the Ben Yehuda Street bombing.

### 5. March 7, 2003 Shooting at Kiryat Arba

On March 7, 2003, two terrorists—Muhsin Muhammad Omar al-Qawasmeh and Hazen

Fawzi Abd al-Sam'i al-Qawasmeh—breached the security fence of the Israeli town of Kiryat Arba,

armed with rifles and grenades, and killed Debra and Eli Horovitz.  Suppl. Mem. Supp. Pls.' Mot.

Def. J. Ex. 1-F at 2, ECF No. 32-7.  Plaintiffs point to ample evidence on the record demonstrating

Hamas' culpability for the attack.

> (1) Hamas issued many detailed declarations claiming responsibility for the
> shooting immediately following the attack; (2) photographs and posters of terrorists
> attest to their organizational affiliation to Hamas, as they show them wearing
> Hamas bandanas and posing with Hamas emblems; (3) the will of the one of the
> perpetrators, Muhsin Muhammad Omar al-Qawasmeh, identifies himself to be a
> member of Hamas; (4) other documents published by Hamas praise the shooters

and give details of the attack; and (5) official documents from the Government of Israel identify Hamas as having carried out the Kiryat Arba Shooting.

Proposed Findings of Fact 13 (internal citations omitted); *see* Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-F at 2–6.  These findings led Drs. Shaked and Levitt to credibly conclude that Hamas operatives committed the Kiryat Arba shooting.  Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-F at 7; Pls.' Mot. Def. J. Ex. A at 22.

Accordingly, the Court will take judicial notice of the jury's factual determination in *Arab Bank* that Hamas is responsible for the Kiryat Arba shooting.

### 6.  March 5, 2003 Bombing of Bus No. 37

On March 5, 2003, Mahmoud Qawasmeh boarded Bus No. 37 in Haifa and blew himself up, killing seventeen people, including Abigail Litle.  Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-G at 2, ECF No. 32-8.  Plaintiffs point to ample evidence on the record demonstrating Hamas' culpability for the attack.

(1) a note was found on the body of the suicide bomber stating that he had carried out the attack in the name of Hamas; (2) Hamas published an official announcement taking credit for the bombing; (3) photographs and posters of the terrorist were published by Hamas in its official Book of Martyrs; (4) other documents published by Hamas praise the bomber and give details of the bombing; and (5) official documents from the Government of Israel identify Hamas and a Hamas cell which the suicide bomber was a member of as having carried out the Bus No. 37 Bombing.

Proposed Findings of Fact 14 (internal citations omitted); *see* Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-G at 2–7.  These findings led Drs. Shaked and Levitt to credibly conclude that Hamas operatives committed the Bus No. 37 bombing.  Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-G at 7; Pls.' Mot. Def. J. Ex. A at 22.

Accordingly, the Court will take judicial notice of the jury's factual determination in *Arab Bank* that Hamas is responsible for the Bus No. 37 bombing.

### 7.  March 27, 2002 Bombing of the Park Hotel

On March 27, 2002, Abd al-Baset Odeh blew himself up at the Park Hotel in Netanya during a Passover Seder, killing thirty people, including Foruk Naimi.  Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-H at 2, ECF No. 32-9.  Plaintiffs point to ample evidence on the record demonstrating Hamas' culpability for the attack.

> (1) a short time after the bombing, Hamas published an official announcement on its official stationery taking credit for the bombing; (2) photographs and posters of the terrorist were published by Hamas and show the bomber wearing emblems of Hamas; (3) the will of the bomber identifies the bomber as being a member of Hamas; (4) other documents published by Hamas praise the bomber and give details of the bombing; and (5) official documents from the Government of Israel identify Hamas and a Hamas cell of which the suicide bomber was a member as having carried out the Park Hotel Bombing.

Proposed Findings of Fact 15 (internal citations omitted); *see* Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-H at 3–12.  These findings led Drs. Shaked and Levitt to credibly conclude that Hamas operatives committed the Park Hotel bombing.  Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-H at 16; Pls.' Mot. Def. J. Ex. A at 21.

Accordingly, the Court will take judicial notice of the jury's factual determination in *Arab Bank* that Hamas is responsible for the Park Hotel bombing.

### 8.  August 19, 2003 Bombing of Bus No. 2

On August 19, 2003, Ra'ed Abd el-Hamid Misk blew himself up in Jerusalem on Bus No. 2.  Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-I at 2, ECF No. 32-10.  The blast killed twenty-three people, including Tehila Nathansen, Mordechai Reinitz, Yissocher Dov Reinitz, Goldie Zarkowsky, and Eli Zarkowsky, and 130 people were injured, including Chana Nathansen, Matanya Nathansen, Shoshana Nathansen, Yehudit Nathansen, Mendy Reinitz, Miriam Richter, and Bshava Zarkowsky Richter.  *Id.*

Plaintiffs point to ample evidence on the record demonstrating Hamas' culpability for the attack.

(1) on the evening of the bombing, Hamas published an official announcement taking credit for the bombing; (2) photographs and posters of the terrorist were published by Hamas identify the bomber as being a member Hamas and show that the bomber was responsible for the Bus No. 2 Bombing; (4) [sic] the will of the bomber identifies the bomber as being a member of Hamas; and (5) [sic] official documents from the Government of Israel identify Hamas and a Hamas cell of which the suicide bomber was a member as having carried out the Bus No. 2 Suicide Bombing.

Proposed Findings of Fact 16 (internal citations omitted); *see* Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-I at 2–8. These findings led Drs. Shaked and Levitt to credibly conclude that Hamas operatives committed the Bus No. 2 bombing. Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-I at 9; Pls.' Mot. Def. J. Ex. A at 23.

Accordingly, the Court will take judicial notice of the jury's factual determination in *Arab Bank* that Hamas is responsible for the Bus No. 2 bombing.

### 9.  January 29, 2004 Bombing of Bus No. 19

On January 29, 2004, a twenty-four-year-old Palestinian policeman named Ali Muneer Ja'ara blew himself up on Bus No. 19 in Jerusalem, killing eleven people and wounding more than fifty others, including Erik Schecter. Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-J at 2, ECF No. 32-11. The *Arab Bank* jury found Hamas to be responsible for the attack, but Judge Cogan held that there was insufficient evidence to prove—by a preponderance of the evidence—that Hamas committed the Bus No. 19 bombing and vacated the jury's verdict. *Linde*, 97 F. Supp. 3d at 330–31.

Although the Court will not reach the same determination that Judge Cogan did, the Court agrees that some of the evidence surrounding this bombing is conflicting. Ja'ara initially contacted the *al-Qassam* Brigades ("AQB"), Hamas' military arm, seeking to carry out a suicide bombing for Hamas. Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-J at 2. Ja'ara's AQB handlers proceeded to train and indoctrinate him. *Id.* But as Ja'ara and one of his AQB handlers travelled to their

intended target location, they encountered a Palestinian roadblock and decided to turn back. *Id.* Undeterred, Ja'ara reached out to members of the al-Aqsa Martyrs Brigades ("AAMB"), Fatah's military arm, seeking to carry out the suicide bombing. *Id.* With a bomb provided by the AAMB, Ja'ara boarded Bus No. 19 and wreaked havoc on dozens of innocent civilians. *Id.* at 12.

In the immediate aftermath of the bombing, Fatah assumed responsibility. *Id.* at 2. But Fatah would later retract its statement and Hamas claimed sole responsibility thereafter. *Id.* Hamas even rebuked Fatah for prematurely assuming responsibility for the attack. *Id.* at n.842. Fatah did not assume responsibility at any point after it retracted its initial claim. *Id.* at 13. According to a Hamas report, a Fatah spokesman even apologized to the AQB for claiming responsibility for the attack. Shaked Presentation 10, ECF No. 35-1.

Before Ja'ara's failed first attempt to commit a suicide bombing, one of his Hamas handlers, Nufal Adawin, photographed him wearing a Hamas bandana and standing in front of a Hamas flag. Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-J at 3–4. Hamas used these photographs in its leaflets assuming responsibility for the attack and in its Book of Martyrs. *Id.* at 3, 5. Ja'ara's handlers also recorded him reading his will, expressing pride in his death as a martyr for Hamas. *Id.* at 3.

Documents of the Israeli Government seemingly contradict each other as well. For example, the initial Israel Security Agency ("ISA") report, published shortly after the bombing, stated that the AAMB assumed responsibility for the attack but did not state any evaluation of Hamas' responsibility for the attack. *Id.* at 6. On February 2, 2004, the ISA issued an announcement following the death of Muhammad Abu Ouda, a Hamas commander.[4] *Id.* In the

---

[4] Israeli soldiers entered Bethlehem and killed Abu Ouda, one of Ja'ara's handlers, two days after the attack. Shaked Tr. 64:23–65:6; 83:9–11, ECF No. 37.

announcement, the ISA stated that, according to its intelligence estimations, Abu Ouda was behind the Bus No. 19 bombing.  *Id.* at 6–7.

Judge Cogan based his decision to find Fatah responsible for the attack on "uncontroverted evidence that the AAMB built and supplied the bomb, that the bomber himself wrote in his will that he was working on behalf of the AAMB, and that several AAMB operatives were convicted for planning the attack."  *Linde*, 97 F. Supp. 3d at 330.  He maintained that Hamas may be morally responsible for the attack by preparing Ja'ara to commit a suicide bombing, but Fatah expended its resources to secure an explosive device for him.  *Id.*

Hamas ought to bear more than just moral responsibility for its actions.  Ja'ara's training likely went well beyond simply showing him how to operate a bomb: the amount of religious and mental preparation required to convince a young man to follow through with a plan to blow himself up cannot be understated.  Dr. Shaked testified in great detail about how terrorist organizations mold a potential suicide bomber to not only kill others, but also himself.  A handler must spend a great deal of time with a recruit (e.g. praying with him, explaining to him that he will live forever after his death, and helping him write his will) to prepare him to carry out an attack.  Shaked Tr. 66:5–22; 74:1–6, ECF No. 37.  A handler also needs to purify the recruit's body and purchase perfume and nice clothes for him so that he is prepared for the afterlife and the seventy-two virgins that he has been told await him.  *Id.* at 70:2–12.  The handlers go through all this trouble to ensure that the recruit has the courage to follow through with the plan once he departs from his handlers.  *Id.* at 11–14.  According to Dr. Shaked, this preparation is more difficult to accomplish than building a bomb.  *See id.* at 66:2–4; 67:3–7.

Furthermore, plaintiffs' counsel acknowledged that there may have been some confusion surrounding the testimony related to Ja'ara's will during the *Arab Bank* trial.  *Id.* at 112:8–25.

Judge Cogan never had the opportunity to address that issue again because the motion for reconsideration was deemed moot. *Id.* at 113:2–8. The Court is not aware of any evidence indicating that Ja'ara wrote another will declaring his actions to be in the service of Fatah.[5]

Finally, the Court is reluctant to second-guess the Israeli sources that found Hamas operatives to be culpable for the attack. After the Israeli government killed Abu Ouda, a Hamas commander, the ISA stated that he was responsible for the Bus No. 19 bombing. Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-J at 6–7. Additionally, at least two Hamas terrorists—Nufal Adawin and Mahmoud Azia—were criminally convicted for their involvement in the bombing.[6] *Id.* at 7–8. Although Judge Cogan correctly pointed out that several AAMB operatives were convicted for their involvement in the bombing, so too were Hamas operatives. Israeli courts thus held members of *both* terrorist organizations accountable for the Bus No. 19 bombing.

In reaching its conclusion that Hamas shares responsibility for the bombing, the Court does not seek to minimize Fatah's own responsibility for the attack—Fatah provided the bomb that, together with its operator, Ja'ara, inflicted death and destruction upon dozens of innocent people. Both Hamas and Fatah are culpable for the horrific events that transpired on January 29, 2004, even if the bombing was not a joint operation between the two terrorist organizations. For purposes of this case, however, the Court is satisfied with the evidence before it and finds Hamas to be responsible for the Bus No. 19 bombing.

### 10.  September 24, 2004 Mortar Attack on Neve Dekalim

---

[5] Dr. Shaked testified that Ja'ara swore allegiance to Hamas alone. *Id.* at 113:20–25.

[6] According to plaintiffs, Judge Cogan's finding that Muhammad Nashash, one of Ja'ara's recruiters, was convicted for his involvement with the AAMB was based on a translation error. Pls.' Mot. Def. J. 10 n.15. The *Arab Bank* plaintiffs filed a motion for reconsideration based in part on the error, but the motion was never ruled on. *Id.* Plaintiffs in this case submitted a corrected translation showing that Nashash was convicted for his involvement with the AQB. *Id.* Ex. B at 2.

On September 24, 2004, terrorists fired three mortar shells into Neve Dekalim, an Israeli settlement in the Gaza Strip.  Suppl. Mem. Supp. Pls.' Mot. Def. J. Ex. 1-K at 2, ECF No. 32-12. Although the exact number of casualties and injuries is unclear, one mortar's blast killed Tiferet Tratner.  *Id.*  Hamas assumed responsibility for the attack.  *Id.* at 2–3.

Judge Cogan properly vacated the jury's verdict with respect to this attack based on the evidence before him.  The only evidence linking Hamas to the attack that was available to the court was Hamas' assumption of responsibility, which did not identify the perpetrators, and Dr. Shaked's contested claim that Hamas was the only terrorist organization using mortars around the time of this attack.  *Linde*, 97 F. Supp. 3d at 302, 330.  The plaintiffs failed to submit corroborating evidence from Israeli or Hamas sources, so Judge Cogan held that the evidence was at best evenly balanced and insufficient to support the jury's verdict.[7]  *Id.* at 330–31.

Plaintiffs in this case presented new corroborating evidence to support Hamas' assumption of responsibility.  At the July 18, 2019 evidentiary hearing, plaintiffs pointed to a Hamas publication—its Book of Martyrs—detailing Sayid Isa Jabar Siam's responsibility for the attack on Neve Dekalim.  Shaked Presentation 11–12, ECF No. 35-2.  Siam was an AQB terrorist who the Israel Defense Forces targeted and killed on July 17, 2005.  *Id.* at 13.  The Israel Ministry of Foreign Affairs acknowledged that Siam was involved in numerous terrorist attacks, including the attack on Neve Dekalim.  *Id.*  Additionally, Dr. Shaked was able to locate the video of the terrorists loading and firing mortar shells into Neve Dekalim.  *Id.* at 14; Notice of Filing, ECF No. 38.  The

---

[7] Dr. Shaked testified before this Court that he studied every one of Hamas' announcements assuming responsibility for terrorist attacks since 1997 and found that Hamas never lied about its involvement.  Shaked Tr. 104:3–7.  Although this testimony strengthens the probative value of Hamas' assumption of responsibility, the Court likely still would have agreed with Judge Cogan if plaintiffs failed to provide any additional evidence.

video clearly shows masked terrorists loading and firing mortar shells with the AQB emblem prominently displayed in the background.[8]

The Court is satisfied with the new evidence and finds Hamas to be responsible for the Neve Dekalim mortar attack.

### C.  Defendants' Actions and Involvement in the Attack

Numerous courts within this District have found Iran and MOIS responsible for providing logistical and financial support to Hamas and have held Iran and MOIS liable for providing support under the FSIA.  *See, e.g.*, *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 14 n.4 (D.D.C. 2009) ("Hamas . . . is an organization that has been supported over the years by the Islamic Republic of Iran, primarily through . . . MOIS."); *Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152, 154 (D.D.C. 2009) (finding sufficient evidence to determine that "Iran and its MOIS provided material support to Hamas in furtherance of its terrorist objectives"); *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 206 (D.D.C. 2008) ("Hamas is an organization supported by Iran . . . ."); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003) (citing evidence showing that Iran routes its financial support for Hamas through MOIS and that a component organization of MOIS provides training to Hamas operatives).  These findings of fact are supported by ample evidence from U.S. Government sources.

In 2001, the State Department concluded that Iran encouraged Hamas and other "Palestinian rejectionist groups" to "escalate their activities" and provided those groups with "varying amounts of funding, safehaven, training, and weapons." U.S. Dep't of State, *Patterns of Global Terrorism 2001* 65 (May 2002), https://2009-

---

[8] The video does not follow the mortar shells to the blast sites within Neve Dekalim, but Dr. Shaked linked the firing of the mortars to the Neve Dekalim attack in his testimony before this Court by translating the video's Arabic explanation.  *Id.* at 101:9–11.

2017.state.gov/documents/organization/10319.pdf.  That year, Ayatollah Khamenei continued to state his view that Israel is a "cancerous tumor" requiring removal, vividly illustrating the sort of hostility underlying Iran's support for Hamas.  *Id.*  The State Department made similar findings in its 2002, 2003, and 2004 reports.  *See* U.S. Dep't of State, *Patterns of Global Terrorism 2002* 77 (April 2003), https://2009-2017.state.gov/documents/organization/20177.pdf; U.S. Dep't of State, *Patterns     of     Global     Terrorism     2003*     88     (April     2004),     https://2009-2017.state.gov/documents/organization/31912.pdf;  U.S. Dep't of State, *Country Reports on Terrorism     2004     88–89     (April     2005),     https://2009-2017.state.gov/documents/organization/45313.pdf.

The Court is confident that defendants' continuous and generous support of Hamas between 2001 and 2004—as well as other years—enabled Hamas to commit numerous atrocities, including the ten attacks at issue here.  As such, the Court finds that Iran and MOIS provided logistical and financial support to Hamas during the relevant time frame and may be held liable for plaintiffs' claims.

## III.  CONCLUSIONS OF LAW

### A.  Jurisdiction and Sovereign Immunity

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  The statute codifies the concept of foreign sovereign immunity, something which is "a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 140 (2014) (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983)).  The FSIA sets forth exceptions to foreign sovereign immunity that provide the only authority for a district court to assert subject matter

jurisdiction over claims against a foreign state. *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34 (D.C. Cir. 2014). "[I]f no exception applies, the district court has no jurisdiction." *Id.*

Because subject matter jurisdiction is premised on the existence of an exception to foreign sovereign immunity, a district court considering a claim against a foreign state must decide whether an exception to immunity applies "even if the foreign state does not enter an appearance to assert an immunity defense." *Verlinden*, 461 U.S. at 493 n.20. This is in keeping with the general rule that "[s]ubject-matter jurisdiction can never be waived or forfeited;" thus, when jurisdictional questions arise in a suit, "courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented." *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012).

### 1. Original jurisdiction

Federal district courts have original jurisdiction over FSIA cases by virtue of 28 U.S.C. § 1330. It provides that original jurisdiction will exist over (1) nonjury civil actions (2) for claims seeking relief *in personam* (3) against a foreign state (4) when the foreign state is not entitled to immunity either under sections 1605 to 1607 of the FSIA or under any applicable international agreement. 28 U.S.C. § 1330(a). Section 1604 of the FSIA reinforces element four, stating that foreign states are presumptively immune from jurisdiction in federal and state courts except to the extent provided in sections 1605 to 1607. 28 U.S.C. § 1604.

All of section 1330(a)'s requirements are met in this case. First, plaintiffs have not demanded a jury trial. This is, therefore, a nonjury civil action. Second, this suit is against defendants as legal persons, not against property. The claims, therefore, seek relief *in personam*. *Cf. Gang Luan v. United States*, 722 F.3d 388, 399 n.15 (D.C. Cir. 2013) ("*In personam* jurisdiction is jurisdiction over the defendant. *In rem* jurisdiction is jurisdiction over the property.").

Third, this suit is against a "foreign state."  One defendant, Iran, is plainly a foreign state. The status of MOIS requires greater consideration.  The FSIA defines a foreign state at section 1603(a) as including "a political subdivision of a foreign state."  28 U.S.C. § 1603(a).  The D.C. Circuit has adopted a "categorical approach" to determining the legal status of foreign government-related entities for purposes of the FSIA's jurisdiction and service of process provisions: "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state."  *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003).  This Court has previously concluded that MOIS is the intelligence organization of Iran and is a conduit of Iranian funds to terrorist organizations. *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003); *see also Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 7 (D.D.C. 2010).  Intelligence gathering and operations are not commercial in nature; they are governmental functions.  MOIS, thus, may be treated as itself a "foreign state" for purposes of section 1603(a).  *See Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 51 (D.D.C. 2012) (finding that MOIS was a foreign state for purposes of those proceedings because the evidence established it was a "division of the state" itself).

### a.  Sovereign immunity

The final requirement for jurisdiction under section 1330(a)—that there be an exception to sovereign immunity as to the defendants—requires more substantial explanation.  The exception to foreign sovereign immunity relevant to this suit is codified at 28 U.S.C. § 1605A, the state-sponsored terrorism exception.  That section establishes that a foreign state has no immunity

> in any case . . . [1] in which money damages are sought [2] against a foreign state [3] for personal injury or death that was [4] caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A (numbering added).  The Court now considers each of these requirements for waiver of sovereign immunity.

First, the complaint identifies and seeks only monetary remedies for plaintiffs' injuries. Second, as established above, both defendants are foreign states as defined by the statute.  Third, plaintiffs have proven various instances of personal injury or death and all claims arise from these instances.  Under section 1605A, such injury or death "must merely be the bases of a claim for which money damages are sought."  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010).  Jurisdiction is not restricted to physical injury suffered directly by each claimant. *Id.*  Thus, plaintiffs' various claims for emotional injuries to the victims' family members—all of which spring from the attacks perpetrated by Hamas—also constitute the type of claims required for jurisdiction.

The fourth element, causation, is established by showing "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Id.* (internal citation omitted).  Plaintiffs need not show that their injuries would not have occurred "but for" defendants' actions.  *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (interpreting the similarly worded causation requirement of the former state-sponsored terrorism exception to foreign sovereign immunity, section 1605(a)(7), as requiring only "proximate cause").

Plaintiffs have sufficiently demonstrated a "reasonable connection" between defendants' acts and their damages.  The facts found by the Court demonstrate that defendants (1) provided substantial support to Hamas through provision of money and training and (2) encouraged the escalation of terrorist activities, including against Israeli targets.  These acts have a reasonable

connection to the attacks ultimately carried out by Hamas.  This is sufficient for the relatively low proximate cause bar imposed by the FSIA.

Finally, plaintiffs' claims must arise out of "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  This act or provision of material support must be engaged in by an officer, employee, or agent of the foreign state within the scope of the actor's office, employment, or agency.  *Id.*

In this context, provision of material support or resources has the same meaning as it is given in section 2339A of Title 18 of the U.S. Code.  28 U.S.C. § 1605A(h)(3).  That section defines "material support or resources" as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

Extrajudicial killing has the same meaning as it is given in section 3 of the Torture Victim Protection Act of 1991.  28 U.S.C. § 1605A(h)(7).  That section defines extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  *See* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (excluding from the definition killings that are lawful under international law).

The ten attacks caused the deaths of numerous innocent civilians, including the deceased victims, and injured many more.  Those who perished were killed not according to the judgment of a regularly constituted court but instead the malicious design of the Hamas terrorists who carried

out the attacks.  The ten attacks were thus extrajudicial killings as defined by the FSIA.  Defendants provided "material support or resources" for these acts by their provision of money and training to Hamas and its members.  Finally, this provision of material support or resources was within the scope of the provider's office, employment, or agency.  As set forth above, MOIS, treated as the foreign state itself, was the primary conduit for the provision of funds and training to Hamas. MOIS' provision of support to Hamas would have required the approval of officials at the highest level of Iran's government.

Thus, the final element for waiver of sovereign immunity under section 1605A is met and defendants are not entitled to sovereign immunity.  Because all of section 1330(a)'s requirements for jurisdiction are satisfied, the Court possesses original jurisdiction over this matter.

### 2.  Requirements for a claim to be heard

Section 1605A only applies if three conditions are met: (1) the foreign state was designated a state sponsor of terrorism at the time of the act giving rise to liability or was so designated in response to such act and remains so designated, (2) the claimant or victim was a national of the United States at the time of the act waiving sovereign immunity,[9] and (3) in cases where the act occurred in the foreign state against whom suit has been brought, the foreign state was afforded a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration.  28 U.S.C. § 1605A(a)(2).  Each of these conditions is met here.

First, Iran was designated by Secretary of State George P. Shultz on January 23, 1984, in accordance with the Export Administration Act of 1979, as a "country which has repeatedly provided support for acts of international terrorism."  49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz).  This designation meets section 1605A's

---

[9] Two other categories of claimants or victims that would meet section 1605A's requirements are not relevant here.

definition of "state sponsor of terrorism." 28 U.S.C. § 1605A(h)(6). Iran continues to be designated as a state sponsor of terrorism to this day. *State Sponsors of Terrorism*, U.S. Dep't of State, http://www.state.gov/j/ct/list/c14151.htm (last visited Sept. 24, 2019). Because Iran was a designated state sponsor of terror at the time of the incidents underlying plaintiffs' claims and because it continues to be so designated, the first condition for a claim to be heard is met.

Plaintiffs should meet the second requirement because they allege that all claimants or victims are or were United States citizens when each attack occurred.[10] Pls.' Mot. Def. J. 5. Finally, plaintiffs have met the third requirement because the "act[s]" described in subsection (a)(1)—i.e. the extrajudicial killings—occurred in Israel, not the defendant state. Thus, plaintiffs were not required by statute to afford defendants a reasonable opportunity to arbitrate.

### 3. Personal jurisdiction

Federal courts have personal jurisdiction over a foreign state if (1) the court has jurisdiction pursuant to section 1330(a) and (2) service has been properly made under section 1608 of the FSIA. 28 U.S.C. § 1330(b). As established above, the requirements for jurisdiction under section 1330(a) are met in this case. The Court next proceeds to an analysis of section 1608's requirements for service.

Section 1608(a) requires that service upon a foreign state or a political subdivision of a foreign state—such as MOIS—be completed in one of four ways. 28 U.S.C. § 1608(a). The methods are presented in order of preference; a method of service must be unavailable or unsuccessful for a party to attempt service under a later method. *Id.* The first three methods are: (1) delivery of a copy of the summons and complaint in accordance with any special arrangement

---

[10] The Court does not presently have sufficient proof before it to establish the citizenship of each plaintiff. To the extent that any plaintiffs are unable to present proof of citizenship at the time of the attacks to the special master, their claims shall be dismissed.

for service between plaintiff and the foreign state, (2) delivery of the same documents in accordance with an applicable international convention on service of judicial documents, or (3) delivery of the same documents as well as a notice of suit, all translated into the foreign state's official language, by mail, return receipt requested.  28 U.S.C. § 1608(a)(1)–(3).  The Court is not aware of any special arrangement for service between these parties and no international convention on service applies.  Plaintiffs were thus authorized to attempt service under subsection 3.  Their attempt was unsuccessful.

Therefore, plaintiffs were authorized to effect service under section 1608(a)(4).  That provision authorizes service

> by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a)(4).  The Clerk of the Court certified mailing the specified documents, translated as required, to the State Department on July 3, 2012.  ECF No. 13.  The State Department subsequently confirmed transmission of the documents to the Iranian Ministry of Foreign Affairs by way of the Foreign Interests Section of the Embassy of Switzerland in Tehran, Iran.  ECF No. 15.  Certified copies of the diplomatic notes showing the date of transmission—September 16, 2012—were attached thereto.  *Id.*  In light of these filings, the Court concludes that plaintiffs have complied with section 1608(a)(4) and have, therefore, properly served defendants in accordance with the FSIA.  The Court may exercise personal jurisdiction over defendants.[11]

---

[11] The Court also notes that no minimum contacts threshold must be met as to the defendants, either as a matter of constitutional or customary international law.  *See Valore*, 700 F. Supp. 2d at 70–71 (concluding that neither Iran nor MOIS, as foreign states, were protected by the Fifth Amendment's Due Process Clause and that customary

### B.  Timeliness

Section 1605A includes a limitations provision, at subsection (b), setting out a series of time periods within which an action under the section "may be brought or maintained."  28 U.S.C. § 1605A(b).  This Court has held that section 1605A's limitations provision is not jurisdictional. *See Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 328 (D.D.C. 2014).  Nonetheless, the Court shall briefly explore the matter because it concludes that plaintiffs have complied with the statute of limitations.

Section 1605A(b) provides that an action may be brought no later than "10 years after the date on which the cause of action arose."  28 U.S.C. § 1605A(b)(2).  The attacks giving rise to this action began on December 1, 2001.  Plaintiffs' first cause of action arose on that date.  *Cf. Amobi v. District of Columbia Dep't of Corr.*, 755 F.3d 980, 994 (D.C. Cir. 2014) (internal citation omitted) (holding that under District of Columbia law, the statute of limitations usually begins running when a plaintiff "sustains a tortious injury").  Plaintiffs filed their complaint on November 30, 2011, less than 10 years from the date their first cause of action arose.  Their claims are timely under section 1605A of the FSIA.

### C.  FSIA Liability

The state-sponsored terrorism exception provides a private right of action.  The action is available to, among others, nationals of the United States and the legal representatives of such persons.  28 U.S.C. § 1605A(c).  Foreign states that meet subsection (a)(2)(A)(i)'s requirements as state sponsors of terrorism may be held liable under subsection (c).  *Id.*

Section 1605A's private right of action has four basic elements.  A plaintiff must prove: (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of

---

international law did not come into play because it cannot prevail over a contrary federal statute).  Satisfaction of section 1330(b) is all that is required for assertion of personal jurisdiction over defendants.

material support or resources for such an act" where (2) the act was committed, or the material support was provided, by the foreign state or agent of the foreign state, and the act (3) caused personal injury or death (4) "for which courts of the United States may maintain jurisdiction under this section for money damages." *Id.* § 1605A (a)(1), (c).

### 1. Threshold determination of plaintiffs' and defendants' statuses

The Court first determines whether the parties are such that subsection (c)'s cause of action may be pursued.

#### a. Defendants are state sponsors of terrorism

Defendants, for the reasons stated above in Part III.A.2, are state sponsors of terrorism within the meaning of section (a)(2)(A)(i) and may be held liable.

#### b. Entitlement of plaintiffs to bring section 1605A(c) action

All of the plaintiffs may pursue section 1605A(c)'s private right of action. All plaintiffs claim to be citizens of the United States and, therefore, should—subject to the special master's determination—fall within subsection (c)(1)'s ambit.

#### c. Standing of estate plaintiffs

Estate plaintiffs seeking to recover on behalf of the deceased victims as their personal representatives for injuries they suffered during life must establish their standing before they may recover. *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12 (D.D.C. 2011) (noting that "recovery for pain and suffering . . . is not universally available to estate-plaintiffs"). The determination of whether an estate may maintain a cause of action for injuries suffered during the decedent's life is a question "governed by the law of the state which also governs the creation of the estate." *Id.* State law governs this issue because it is not related to the extent and nature of the

claims, but instead involves a threshold question regarding the "power of the estate to bring and maintain legal claims." *Id.*

The Court does not presently have sufficient proof before it to establish each estate plaintiff's standing under applicable state law to recover on behalf of the deceased victims. To the extent that any estate plaintiffs seeking to recover such damages are unable to present proof of standing under applicable state law to the special master, their claims shall be dismissed.

### 2. Act

For the reasons stated in part III.A.1.*a*, the Court finds that the acts giving rise to this case are of the type for which a foreign state may be held liable under section 1605A(c). Specifically, the evidence establishes that acts of extrajudicial killing were committed by members of Hamas and that defendants provided material support in furtherance of those acts.

### 3. Actor

Defendants may be held liable under section 1605A(c) only if they or their agents committed the extrajudicial killings or provided material support for them. 28 U.S.C. § 1605A(c). The facts found by the Court show that MOIS was Iran's conduit for the provision of funding and training to Hamas and its membership. Therefore, Iran itself is treated as having provided material support. *See Roeder*, 333 F.3d at 234 (holding that the actions of a political subdivision of a foreign state are attributable to the foreign state itself because they are treated as legally the same under the FSIA).

### 4. Theory of recovery—causation and injury

The elements of causation and injury under section 1605A(c) require plaintiffs "to prove a theory of liability" which justifies holding defendants culpable for the injuries that plaintiffs have allegedly suffered. *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus*, 750 F. Supp. 2d at 175–76

("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability.").  While section 1605A(c) requires courts to determine the substantive basis for liability arising under it, the court is not given the authority (or duty) to articulate "federal common law."  *Valore*, 700 F. Supp. 2d at 76.  Instead, because liability under section 1605A(c) is based on "statutory rights," federal judges are instructed to "find the relevant law, not to make it."  *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003).  Thus, judges may not "fashion a complete body of law" in considering claims under section 1605A(c).  *Id.*  Based on the D.C. Circuit's guidance, courts in this jurisdiction "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" to define the elements and scope of these theories of recovery.  *Oveissi*, 879 F. Supp. 2d at 54 (quoting *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)).  Plaintiffs seek to recover economic damages arising from the deceased victims' wrongful deaths, survival damages for their pain and suffering prior to death, solatium damages for intentional infliction of emotional distress ("IIED"), battery damages on behalf of the injured victims, assault damages on behalf of the injured victims, and punitive damages on behalf of all plaintiffs.[12]  The Court will consider each theory of recovery below.

     *a.  Wrongful death*

     Plaintiffs seek recovery for economic losses accruing to the estates of the deceased victims under Count II of the Complaint.  This Court has previously determined that a decedent's heirs at law, through the decedent's estate, may bring a wrongful death action under section 1605A(c) "for

---

[12] Count I states vague and duplicative claims for relief, most of which can be dealt with in Counts II-VI.  Count I also mentions attorneys' fees, but the Court will address that matter in a post-judgement motion pursuant to Federal Rule of Civil Procedure 54(d)(2).  The Court will not direct plaintiffs to schedule a post-judgment conference in accordance with Local Civil Rule 54.2(a) because defendants have not appeared in this case.

economic losses which result from a decedent's premature death." *Valore*, 700 F. Supp. 2d at 78 (internal citation omitted).  Where defendants are liable for a decedent's extrajudicial killing, as these defendants are, they may be held "liable for the economic damages caused to decedents' estates." *Id.*  Plaintiffs have sufficiently proved the validity of their wrongful death theory of recovery against defendants.

### b. Survival claim for pain and suffering

Plaintiffs seek damages for the deceased victims' pain and suffering between the moment of the attacks and their deaths under Count III of the Complaint.  A survival claim is one "that could have been brought by the decedent, had he lived to bring it." *Valore*, 700 F. Supp. 2d at 77 (citing Restatement (Second) of Torts § 926).  The recovery is limited, however, to harms suffered before death.  Restatement (Second) of Torts § 926(a).

The Court is thus constrained by the rule that "[i]f death was instantaneous there can be no recovery . . . for pain and suffering" of the decedent.  *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000) (citation omitted); *cf. Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 8 (D.D.C. 2000) (awarding damages to estates of decedents who endured several minutes of pain and suffering prior to death); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998) (awarding damages to estates of decedents who endured several hours of pain and suffering prior to death).  The Court does not presently have sufficient proof before it to establish each individual plaintiff's right to recover on these bases.  To the extent that any plaintiffs seeking pain and suffering damages are unable to present proof of the deceased victims' pain and suffering to the special master, their claims shall be dismissed.

### c. Intentional infliction of emotional distress

Plaintiffs seek to recover solatium damages for defendants' intentional infliction of emotional distress under Count IV of the Complaint.  Relying principally on the Restatement (Second) of Torts, this Court has set out the following standard for recovery on a theory of IIED in section 1605A(c) cases: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46(1)).

An actor may also be liable for IIED to a party against whom the extreme and outrageous conduct was not directed if that party is (1) a member of the victim's immediate family and (2) was present at the time of the extreme and outrageous conduct.  *See Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010) (citing Restatement (Second) of Torts § 46(2)(a)). The "immediate family" requirement is strictly construed in FSIA cases; generally, only spouses, parents, siblings, and children are entitled to recover.  *Id.*  As to the issue of presence, this Court has previously held that one "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result."  *Valore*, 700 F. Supp. 2d at 80.  This is because terrorism is sufficiently extreme and outrageous to demonstrate that it is intended to inflict severe emotional harm on even those not present at the site of the act.  *Id.*

The plaintiffs have stated a valid theory of recovery as to their IIED claims.  As this Court has previously held, "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress."  *Murphy*, 740 F. Supp. 2d at 74 (quoting *Belkin*, 667 F. Supp. 2d at 22).  The evidence establishes that "Iran intentionally provided material support to Hamas, and did so with the intent that Hamas would carry out attacks that

would cause severe emotional distress." *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 104 (D.D.C. 2006). Furthermore, the requirement imposed on family members to have been present at the site of the attack is not imposed when the extreme and outrageous conduct is a terrorist attack.

Finally, the Court does not presently have sufficient proof before it to establish each family member's right to recover on these bases. To the extent that any family members are unable to establish that they are members of the victims' immediate family to the special master, their claims shall be dismissed.

### d. Assault and battery

Survivors of the attacks seek to recover damages for assault and battery under Counts V and VI of the Complaint. A defendant is liability for assault in a section 1605A(c) case if "(1) it acted 'intending to cause a harmful contact with . . . , or an imminent apprehension of such a contact' by, those attacked and (2) those attacked were 'thereby put in such imminent apprehension.'" *Valore*, 700 F. Supp. 2d at 76 (alteration in original) (quoting Restatement (Second) of Torts § 21(1)). Liability for battery arises when a defendant "acted 'intending to cause a harmful or offensive contact with . . . , or an imminent apprehension of such a contact' by, those attacked and (2) 'a harmful contact with' those attacked 'directly or indirectly result[ed].'" *Id.* at 77 (alteration in original) (quoting Restatement (Second) of Torts § 13).

The Court concludes that element one of both assault and battery have been sufficiently proved because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Id.* As for element two of each theory, the Court does not presently have sufficient proof before it to establish each individual plaintiff's right to recover on these

31

bases.  To the extent that any plaintiffs alleging assault or battery are unable to present proof of their injuries to the special master, their claims shall be dismissed.

### e.  Punitive damages

Finally, plaintiffs seek punitive damages under Count VII of the Complaint.  The FSIA specifically permits an award of punitive damages for personal injury or death resulting from an act of state-sponsored terrorism.  28 U.S.C. § 1605A(c).  Punitive damages is not an independent cause of action.  *Estate of Botvin v. Islamic Republic of Iran*, 604 F. Supp. 2d 22, 25 (D.D.C. 2009).  This is not the end of the matter, however.  Plaintiffs have alleged several independent claims for which punitive damages may be an appropriate remedy.  *Cf. Rimkus*, 750 F. Supp. 2d at 175–76 (allowing a "claim" for punitive damages to proceed because it was supported by sufficiently specific allegations of a cause of action under section 1605A).  The Court will treat plaintiffs' punitive damages count as, in effect, a request for punitive damages as a remedy for their other claims against defendants.  *See Park v. Hyatt Corp.*, 436 F. Supp. 2d 60, 66 (D.D.C. 2006) (treating a claim for punitive damages as "part of an ad damnum clause").  The Court will consider the proper measure of punitive damages, if any, at the time it considers the special master's recommendations regarding compensatory damages.

### 5.  Personal injury

For the reasons stated in part III.A.1.*a*, this suit is one for "person injury or death."  This element of section 1605A(c)'s private right of action is also met.

### 6.  Jurisdiction

For the reasons laid out above in part III.A.1, the Court "may maintain jurisdiction" over this suit.  In light of plaintiffs' satisfaction of subsection (c)'s requirements, the Court concludes that defendants may be held liable to them on the basis of this statute.

## IV.  SPECIAL MASTER

Section 1605A authorizes federal courts to "appoint special masters to hear damage claims brought under this section." 28 U.S.C. § 1605A(e)(1). Although the Court today makes legal conclusions regarding defendants' liability, it does not have sufficient evidence before it to ascertain the amount of damages to which each plaintiff may be entitled. The Court will, therefore, invoke its power under the FSIA to appoint a special master for the purpose of taking evidence and filing a report and recommendation regarding the amount of individual damages for which defendants may be liable to each plaintiff.

## V.  CONCLUSION

For the foregoing reasons, the Court finds that defendants Iran and MOIS are jointly and severally liable for the ten attacks and the death and destruction that they caused. The Court will grant plaintiff's motion for default judgment as to liability and appoint a special master to receive all other evidence necessary to determine each plaintiff's entitlement to damages. A separate order follows.


Date:   September 27, 2019                          ___/s/_____
                                                    Royce C. Lamberth
                                                    United States District Judge