UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BAXTER, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:11-cv-2133-RCL** |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | |
| *Defendants.* | |
| BAXTER, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:18-cv-1078-RCL** |
| SYRIAN ARAB REPUBLIC, *et al.*, | |
| *Defendants.* | |
| TRATNER, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:18-cv-2971-RCL** |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | |
| *Defendants.* | |

**<u>MEMORANDUM OPINION</u>**

This Opinion addresses the only remaining claims brought by a group of plaintiffs for eleven attacks perpetrated by the Islamic Resistance Movement ("Hamas") between 2001 and 2004. The Court has found the Syrian Arab Republic ("Syria") and the Syrian Air Force Intelligence ("SAFI") (collectively "the Syrian Defendants") liable for injuries caused by ten of

those attacks. Another court in this district has found defendants the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") liable to the sole plaintiff-victim of the eleventh attack, Nethaniel Bluth, for the injuries he sustained. However, because of some procedural mischief by Mr. Bluth's attorneys, this Court has not yet addressed his claims against the Syrian Defendants. It will do so here.

Plaintiff Nethaniel Bluth seeks compensatory and punitive damages for injuries he sustained in a terrorist attack allegedly carried out by Hamas at a yeshiva in Atzmona, Israel on March 7, 2002 ("the Attack" or "the March 7, 2002 Attack"). He alleges that as a result of the Attack, he suffered "burns over much of his body, and had injuries to his head, face, and chest." Pl.'s Mot. for Default J. 10, ECF No. 98-1. Mr. Bluth already holds a default judgment against Iran for the same Attack, and he now asks the Court to enter default judgment in his favor against the Syrian Defendants for their support of Hamas in carrying out the Attack.

For the reasons that follow, the Court will **GRANT** Mr. Bluth's Motion [ECF No. 98] and enter default judgment against the Syrian Defendants. The Court will further **ORDER** that Alan Balaran be retained as special master to receive evidence from Mr. Bluth necessary to determine his entitlement to damages along with the rest of the plaintiffs in this case.

## I.    BACKGROUND

There are several cases related to the instant one, each of which contains information pertinent to this case. Mr. Bluth has asked the Court to tie together the loose threads from the three cases in which he has been a plaintiff and use the collective findings of fact and conclusions of law from those cases to find that the Syrian Defendants are liable for the injuries he sustained in the March 7, 2002 Attack. The Court will briefly review those related cases to recount the unusual procedural posture of this case before entering findings of fact and conclusions of law.

In 2011, a group of plaintiffs filed the Complaint in this case against Iran, MOIS, and the Syrian Defendants for their support of eleven separate terrorist attacks allegedly perpetrated by Hamas. Compl., ECF No. 1. The March 7, 2002 Attack was one of the eleven attacks included in the original Complaint, and Mr. Bluth was the only plaintiff who sued Iran and Syria for that specific attack. *Id.* ¶ 28. The other ten attacks took place at various locations between December 2001 and September 2004. Because the plaintiffs had difficulty serving Syria during its prolonged civil war, this Court severed their claims against Iran from their claims against Syria so that the claims against Iran could proceed while the plaintiffs continued to attempt service on Syria. Severing Order, ECF No. 31. The claims against Iran moved forward under this case, *Baxter v. Islamic Republic of Iran*, No. 11-cv-2133 (RCL) ("*Baxter I*") while the severed claims against the Syrian Defendants proceeded under the newly created case, *Baxter v. Syrian Arab Republic*, No. 18-cv-1078 (RCL) ("*Baxter II*").[1]

In 2012, for reasons unknown to this Court, plaintiff Bluth and his family filed a third lawsuit against Iran and Syria alleging battery and intentional infliction of emotional distress ("IIED") for that same March 7, 2002 Attack. *See* Compl. ¶¶ 49–55, *Bluth v. Iran*, No. 12-cv-250 (GK) (D.D.C. Feb. 13, 2012), ECF No. 3. That suit was assigned to Judge Kessler and proceeded parallel to this case, but the claims in the complaint before Judge Kessler closely resemble the claims in this case. *Compare id.* at ¶¶ 49–55 (alleging "battery" and "intentional infliction of emotional distress" *with* Compl. ¶ 32 (alleging "pain, suffering, trauma, mental anguish and extreme emotional distress"). Just as surprisingly, a review of both dockets reveals that the

---

[1] In 2018, a separate group of plaintiffs sued Iran and Syria for two of the eleven attacks in the original complaint. *Tratner v. Islamic Republic of Iran*, No. 18-cv-2971 (RCL). Although this Court entered judgment for those plaintiffs and against Syria in the same Order as most of the plaintiffs in this case, the *Tratner* case is not relevant to the claims here.

plaintiff failed to ever notify this Court or Judge Kessler that the two related[2] cases were proceeding simultaneously, as required by Local Rule LCvR 40.5(b).  For the reasons explained below, however, the Court will address Mr. Bluth's claims against Iran notwithstanding his failure to notify the Court of the case in front of Judge Kessler while it was adjudicating his claims in this case.

In 2015, because of similar problems the plaintiffs in this case had serving the Syrian defendants, Judge Kessler severed Mr. Bluth's claims against Syria from those against Iran. Severing Order, *Bluth v. Iran*, No. 12-cv-250, ECF No. 35.  The claims of the Bluth plaintiffs against Syria proceeded under a fourth case, *Bluth v. Syria*, No. 15-cv-665 (DLF).

In 2016, Judge Kessler entered judgment against Iran and for plaintiff Bluth in the amount of $6 million.  *Bluth v. Iran*, 203 F. Supp. 3d 1, 24 (D.D.C. 2016).  The case against Syria was reassigned to Judge Friedrich in 2017, and in 2018 Judge Friedrich ordered the Clerk to close the case after the plaintiffs filed a notice of voluntary dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1).  Minute Order, *Bluth v. Syria*, No. 15-cv-665 (DLF) (D.D.C. March 4, 2018).

In June 2019—several years after Judge Kessler's *Bluth* decision and the dismissal of the *Bluth* plaintiffs' claims against Syria, but before any resolution by this Court of *Baxter I* or *Baxter II*—plaintiff Bluth voluntarily dismissed his claims against Iran in this case.  Notice of Voluntary Dismissal, ECF No. 34.  He filed no similar notice in the *Baxter II* case against Syria.

In September 2019, this Court entered judgment against Iran and for the other plaintiffs listed in the Complaint for the other ten attacks listed in the Complaint.  Order, ECF No. 40. The Court's accompanying Memorandum Opinion mentioned in a footnote that Mr. Bluth had

---

[2] Indeed, the cases were not only related but *identical* except for the addition of Mr. Bluth's family members as plaintiffs in the Judge Kessler case.

dismissed his claims against Iran regarding the March 7, 2002 Attack. Mem. Op. 5 n.3, ECF No. 41. The Court did not rule on Mr. Bluth's claims or otherwise mention the March 7, 2002 Attack except in that footnote.

In July 2022, the Court entered judgment against Syria and for the other plaintiffs listed in the Complaint for the other ten attacks listed in the Complaint. Order of July 19, 2022, *Baxter v. Syria*, No. 18-cv-1078 (RCL) (D.D.C. July 29, 2022), ECF No. 49.[3]  In its accompanying Memorandum Opinion, the Court did not mention either Mr. Bluth or the March 7, 2002 Attack. Mem. Op., *Baxter v. Syria*, No. 18-cv-1078 (RCL) (D.D.C. July 29, 2022), ECF No. 48. Upon motion of the plaintiffs, the two *Baxter* cases were consolidated[4] after judgment was entered in each case. Order Granting Mot. to Consolidate, ECF No. 97.

Combining the information from these four cases, the Court faces the following scenario: Mr. Bluth holds a judgment against Iran for $6 million for its support of Hamas in the March 7, 2002 Attack. *Bluth*, 203 F. Supp. 3d at 26 (D.D.C. 2016). He voluntarily dismissed his claims against Syria for the same Attack in the severed case before Judge Friedrich. Notice of Voluntary Dismissal, *Bluth v. Syria*, No. 15-cv-665 (DLF) (D.D.C. Jan. 19, 2018), ECF No. 4. The other plaintiffs, who originally filed suit alongside Mr. Bluth in the Complaint that initiated this lawsuit, hold separate judgments against both Iran (*Baxter I*) and Syria (*Baxter II*) for the other ten attacks listed in the Complaint. In the opinions accompanying those judgments, this Court found that both Iran and Syria had provided material support to Hamas in its war on terror. Therefore, the only claims that have not been adjudicated are the outstanding claims in this case brought by Mr. Bluth against Syria for the eleventh attack. Those claims were originally filed in 2011 in this lawsuit

---

[3] That Order also granted judgment for the *Tratner* plaintiffs.

[4] The *Tratner* case was also consolidated.

and were not voluntarily dismissed along with the identical claims that were in front of Judge

Friedrich. So, says Mr. Bluth, all that is left now is for this Court to enter judgment against Syria

and for Mr. Bluth for the March 7, 2002 Attack perpetrated by Hamas.

However, because plaintiff Bluth has already alleged the claims against Syria in this action

in his separate action in front of Judge Friedrich, the Court must assure itself that Mr. Bluth's

claims against Syria are not precluded by *res judicata* due to his decision to bring them in his

separate case before Judge Friedrich, Case No. 15-cv-665. "The doctrine of res judicata usually is

parsed into claim preclusion and issue preclusion." *NextWave Personal Commc'ns, Inc. v. F.C.C.*,

254 F.3d 130, 143 (D.C. Cir. 2001) (citing *I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co.*,

723 F.2d 944, 946 (D.C. Cir. 1983)). "Under the claim preclusion aspect of res judicata, a final

judgment on the merits in a prior suit involving the same parties or their privies bars subsequent

suits based on the same cause of action." *Id.* (citing *I.A.M.*, 723 F.2d at 946–47). Issue preclusion,

meanwhile, precludes parties from relitigating *issues* that were litigated and determined after a

final judgment on the merits in a prior suit, "regardless of whether the subsequent suit is based on

the same cause of action." *Id.* at 147 (citing *I.A.M*, 723 F.2d at 947). "For issue preclusion to

apply, however, 'the issue must have been actually and necessarily determined by a court of

competent jurisdiction in the first trial.'" *Id.* (citing *Connors v. Tanoma Mining Co.*, 953 F.2d 682,

684 (D.C. Cir.1992)). Although issues of claim preclusion and issue preclusion are typically raised

as affirmative defenses, courts may consider them sua sponte in order to preserve judicial resources

and prevent duplicative litigation. *See Stanton v. District of Columbia Court of Appeals*, 127 F.3d

72, 77 (D.C. Cir. 1997) ("As res judicata belongs to court as well as to litigants . . . a party's

forfeiture of the right to assert it . . . does not destroy a court's ability to consider the issue sua

sponte.").

Additionally, there is the separate-but-related issue of claim-splitting. Claim-splitting occurs when a plaintiff "seeks 'to maintain two actions on the same subject in the same court, against the same defendant at the same time.'" *Clayton v. District of Columbia*, 36 F. Supp. 3d 91, 94 (D.D.C. 2014) (citing *Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011)). This Circuit has traditionally applied a "first-in-time" rule for instances of claim-splitting: The court where a suit is first commenced is allowed to proceed to its decision first. *Wash. Metro Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980). The rationale for this rule is to avoid the expenditure of judicial resources and to prevent contradictory decisions by two courts of equal authority hearing the same case. *UtahAmerican Energy v. Dep't Lab.*, 685 F.3d 1118, 1124 (D.C. Cir. 2012). While the rule originally only applied to cases filed in two different federal courts, subsequent case law has made clear that the rule also applies to cases filed within the same District Court before two different judges. *Id.* at 1123.

Here, neither claim preclusion, issue preclusion, nor the rule against claim-splitting will prevent Mr. Bluth from pursuing his claims against Syria. All three of these doctrines seek to estop parties from re-litigating claims or issues raised in another court. Under the two *res judicata* doctrines, parties are prevented both from bringing identical causes of action against the same defendants (claim preclusion) and from re-litigating issues that were litigated or determined by another court (issue preclusion) after another court enters *final judgment on the merits*. However, as mentioned above, Judge Friedrich did not reach a final judgment on the merits. Instead, she only ordered the Clerk to close the plaintiffs' case against Syria upon their motion to voluntarily dismiss the claims due to an inability to serve the Syrian Defendants. Minute Order, *Bluth v. Syria*, No. 15-cv-665 (DLF) (D.D.C. March 4, 2018). And when a plaintiff voluntarily files notice of dismissal of an action before the defendant serves an answer or motion for summary judgment, the

dismissal is "without prejudice." Fed. R. Civ. P. 41(a)(1). Therefore, there is no final judgment on the merits that would allow the Court to invoke claim preclusion. *NextWave Personal Commc'ns, Inc.*, 254 F.3d at 143. And since the case was dismissed voluntarily before an answer or motion for summary judgment was filed, no issues were "actually and necessarily determined by a court of competent jurisdiction" and issue preclusion does not apply. *Id.* at 147 (citing *Connors*, 953 F.2d at 684).

As for the claim-splitting issue, as previously mentioned, the rule in this Circuit is that the Court where a suit is first commenced should be allowed to proceed to its decision first. The instant lawsuit was filed *before* the *Bluth v. Iran* suit that was filed with Judge Friedrich. While thornier *res judicata* and claim-splitting issues would have arisen if that suit had been filed first and adjudicated on the merits, the fact that the claims there were voluntarily dismissed without prejudice means that this Court still has an opportunity to be the first to reach a decision on the merits. While Mr. Bluth's decision to file a separate lawsuit centered on the same claims created a waste of time and resources for Judge Friedrich, the fact that this Court, which was "first in time" to receive Mr. Bluth's claims, still has an opportunity to be the first to reach the decision on the merits means that there is no claim-splitting issue. The Court will therefore proceed to rule on Mr. Bluth's claims.

Because the Syrian Defendants have not responded to the Motion for Default Judgment and the Clerk has entered default, the Motion is ripe, and the Court can proceed with its analysis.

## II.    LEGAL STANDARD

The Federal Rules of Civil Procedure and Foreign Sovereign Immunities Act (FSIA) together establish the standard a court must apply in determining whether to award default judgment to a plaintiff proceeding against a foreign sovereign. Federal Rule of Civil Procedure 55(a) requires the Clerk of the Court to enter a party's default if the party "against whom a

judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a).

Under the FSIA, a court may not enter default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). A district court retains discretion "to determine precisely how much and what kinds of evidence the plaintiff must provide" to establish their claim or right to relief. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). But this grant of discretion to district courts is not a free pass for them to accept the plaintiff's assertions as true. Instead, courts are required to "inquire further before entering judgment" against foreign sovereign parties in default. *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (Lamberth, C.J.) (citing *Oveissi v. Republic of Iran*, 498 F. Supp. 2d 268, 272 (D.D.C. 2007)). This Court has said in the past that it can rely on, among other things, plaintiffs' "uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (quoting *Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001)).

### III.    FINDINGS OF FACT

Mr. Bluth has asked this Court to take judicial notice of the findings of fact and conclusions of law made by this Court in *Baxter I* and *Baxter II*, and by Judge Kessler in *Bluth*. Pl.'s Mot. for Default J. 1–2. The Federal Rules of Evidence allow a court to take judicial notice of facts that are "not subject to reasonable dispute" either because they are "generally known within the trial court's territorial jurisdiction" or because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Given the numerous FSIA cases heard in the District of Columbia, courts in this district have adhered to this rule in taking "judicial notice of court records in related proceedings" when adjudicating FSIA

cases. *Rimkus*, 750 F. Supp. 2d at 171 (citing *Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938)). While courts must be careful to avoid simply accepting any implications that arise from the existence of prior opinions, the validity of the judicial record itself is generally "not subject to dispute" and recognition of that record is therefore "a proper exercise of judicial notice." *Id.* at 172. However, it is still up the Court to determine the significance of that evidence in the case before it, and the Court must evaluate the implications of the prior cases of which it takes judicial notice and the allegations alleged in the complaint before it.

### A. The Court Will Take Judicial Notice of Its Own Findings in *Baxter I* and *Baxter II* and Judge Kessler's Findings in *Bluth v. Iran*

This protracted litigation has been before the Court for over a decade. Since the initial entry of default judgment on behalf of the plaintiffs for the ten other attacks alleged in the original Complaint, this Court has adjudicated that same set of claims against Syria, Judge Kessler has adjudicated the claims by Mr. Bluth against Iran, and the Special Master has begun his calculation of damages on behalf of all plaintiffs beside Mr. Bluth. A voluminous record already exists, therefore, with respect to many of the factual issues presented in this case. The Federal Rules of Evidence allow for courts to take judicial notice of earlier, related cases precisely so that the Court can avoid the "onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack." *Rimkus*, 750 F. Supp. 2d at 172.

As this Court has stated before, the consideration of prior related cases does not—indeed, it may not—absolve this Court of its statutory obligation to ensure that the moving party "establish[] his claim or right to relief by evidence satisfactory to the court." *Id.* (citing 28 U.S.C. § 1608(e)). However, the Court may still rely upon findings of fact reached in earlier opinions because "such records are perfectly capable of establishing the type and substance of

evidence that was presented to earlier courts," and the Court may take judicial notice of that evidence as it considers whether Mr. Bluth has established his claim against Syria in *this case* by evidence satisfactory to the Court. *Id.* Because the three cases contain evidence pertinent to the claims raised by Mr. Bluth against Syria, the Court will take judicial notice of that evidence. Notwithstanding the judicial notice of these prior opinions, the lack of opposition in default judgments cautions against "unquestioningly accept[ing] a complaint's unsupported allegations as true." *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012). The rest of this Opinion is therefore devoted to explaining why those earlier opinions, coupled with other evidence presented by the plaintiffs, provide evidence satisfactory to the Court that the plaintiff has established his claim for relief.

### B. The March 7, 2002 Attack

The horrific events of the March 7, 2002 Attack have been described in detail in Judge Kessler's opinion in *Bluth*. The Court will briefly recount the Attack and Hamas's responsibility for it before discussing Syria's support of Hamas at the time of the Attack. Most of the facts come from findings entered by Judge Kessler' after an evidentiary hearing at which Mr. Bluth testified.[5]

Plaintiff Nethaniel Bluth was one of approximately 120 students studying at the yeshiva— a traditional Jewish educational institution—in Atzmona, Israel in 2002. *Bluth*, 203 F. Supp. 3d at 9. A devoted student, Mr. Bluth chose to attend the yeshiva in part because his two brothers had attended it before him, and also because he wanted to expand upon the education he received in the small, religious community in which he was raised before joining the Israeli army. *Id.* An equally devoted son, Mr. Bluth traveled back home to spend the Sabbath with his family almost

---

[5] The Court has also reviewed the transcript of the evidentiary hearing.

every week, which meant that he typically stayed at the yeshiva late on Thursdays to get ahead on his studies. *Id.*

March 7, 2002, was one such Thursday. Along with thirty other students, Mr. Bluth was attending a lecture at approximately 11:30pm local time when an unfamiliar popping sound outside the classroom interrupted the session. *Id.* When Mr. Bluth looked out the classroom window, he observed his close friend Asher Marcus chatting with the rabbi who was on guard duty that night. *Id.* Almost immediately, gunfire and explosions caused those two individuals to flee their station and run toward Mr. Bluth's classroom. *Id.* at 10. Chaos ensued as Mr. Bluth opened the door for Asher and the rabbi to seek shelter inside the classroom. Just as Asher entered the threshold, however, he was shot in the back and fell on Mr. Bluth. *Id.* Mr. Bluth looked out the doorway with his bleeding friend on top of him, and he saw the attacker emerge and begin firing his gun into the classroom. *Id.* Mr. Bluth warned the members of the class that the attacker was approaching, but the unarmed, devoutly religious group could do nothing except sit, wait, and pray.

The attacker continued his rampage by throwing two grenades into the crowded classroom through a window. *Id.* The first grenade exploded approximately ten feet from Mr. Bluth, while the second exploded elsewhere in the classroom. The attacker then turned his attention to a different area to sew more chaos in another area of the yeshiva, where he was met by Israeli soldiers and ultimately killed after a twenty-minute firefight. *Id.* Mr. Bluth was one of twenty-three individuals injured in the Attack. His friend Asher succumbed to his gunshot wound and was one of five individuals killed by the attacker. *Id.* When Mr. Bluth was brought outside for additional treatment, he saw the bodies of Asher and another one of his friends, Eran Picard, laid out on the ground outside the classroom. *Id.*

Among the Attack's survivors, Mr. Bluth's injuries were among the most serious, as he was one of two victims to be immediately transported by helicopter to Tel Hashomer Hospital. *Id.* at 11. At first, doctors perceived only a bullet entry wound with no exit wound and feared that a bullet may have remained lodged inside Mr. Bluth near his heart. *Id.* Almost immediately, Mr. Bluth "went into multiple surgeries for his ears, the embedded shrapnel, and bullet wound" as doctors frantically worked to save his life and remove the potentially imbedded bullet. *Id.* While the doctors eventually ruled out a lodged bullet, they still had to remove shrapnel left behind by the grenade explosions from Mr. Bluth's chest. *Id.* And in addition to the stitches required for the open wounds that remained after removing shrapnel from his arms, forehead, and chest, Mr. Bluth underwent plastic surgery for his face and head, which included the surgical reattachment of part of his scalp to his skull. *Id.* at 12. Ultimately, doctors concluded that there was no damage to Mr. Bluth's vital organs, and they released him from the hospital several days after the Attack. *Id.*

Mr. Bluth returned to his family home following discharge from the hospital, and he continued to return to the hospital for outpatient treatment during his recovery. *Id.* In the immediate aftermath of the Attack, he required help with everyday activities and became "hesitant and extra cautious" with everyone around him. *Id.* He returned to the yeshiva "as soon as he could," testifying at the evidentiary hearing before Judge Kessler that doing so was necessary "to understand what had happened." *Id.* Upon completion of his studies, Mr. Bluth entered the Israeli army in March 2003—just one year after the Attack. *Id.* at 13. His enlistment was also affected by his injuries, as the army had to find a way for him to complete his mandatory service while taking into account the serious limitations occasioned by his injuries. He served in the army for five and a half years, during which time he regained some of his self-confidence. *Id.* However, he continues to carry a firearm at all times in order to feel safe. *Id.*

But it is the long-term effects of the Attack that continue to plague Mr. Bluth. Most notably, the proximity of the first grenade explosion caused Mr. Bluth to completely lose hearing in his left ear, and he suffers from partial hearing loss in his right ear. *Id.* His loss of hearing, combined with high levels of fear, anxiety, paranoia, and extreme emotional fluctuations cause Mr. Bluth to feel continuously disoriented and suffer occasional flashbacks to the night of the Attack. *Id.* Moreover, his scars are yet another physical reminder of the Attack, and he continues to suffer from nightmares, a fear of the dark, and paranoia of loud noises. *Id.*

Although the Attack itself was perpetrated by an individual named Mohammad Farahat, the National Consortium for the Study of Terrorism and Responses to Terrorism ("START") confirmed that Hamas claimed responsibility for the Attack. *Id.* at 10. Additionally, Farahat's mother had deep ties to Hamas. She harbored a Hamas military leader for fourteen months during Farahat's childhood, and she explained in a video after the Attack how "proud she was to sacrifice her son Farahat to Allah." *Id.* His mother also praised him as the "model martyr," and she "won a seat in the Palestinian Legislative Council on the Hamas ticket" after his death. *Id.* From this evidence, the Court can conclude that Hamas was responsible for the March 7, 2002 Attack perpetrated by Farahat.

If Hamas provided the triggerman for the Attack, it was Iran and Syria who jointly provided the gun. The Court found in its earlier opinion in *Baxter II* that both of the Syrian Defendants provided substantial assistance to Hamas at the time of the March 7, 2002 Attack. Mem. Op. 8, *Baxter v. Syria*, No. 18-cv-1078, (D.D.C. July 29, 2022) ECF No. 48. Specifically, the Court noted that "Syria has been designated as a state sponsor of terrorism by the State Department since 1979." *Id.* (citing U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ [https://perma.cc/77SR-UQGP]). Syria also provided Hamas with support,

resources, "a base from which to operate," and training throughout the 1990s and early 2000s. *Id.* (first citing *Roth v. Syrian Arab Republic*, No. 1:14-cv-1946 (RCL), 2018 WL 4680270, at *3 (D.D.C. Sept. 28, 2018); and then citing *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 71 (D.D.C. 2017)). SAFI, too, materially supported Hamas during the time period that encompassed the March 7, 2002 Attack. This Court has found that SAFI was an "essential part[] of the political structure of . . . Syria and acted as [a] conduit[] for the state['s] provision of funds to terrorist organizations," including Hamas. *Wurtz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 32 (D.D.C. 2012). The record supports the conclusion that the Syrian Defendants' support of Hamas was so pervasive as to permeate the entirety of Hamas's operations. Hamas would not have been able to operate during the early 2000s without the support of the Syrian Defendants, making everything Hamas did during that time period at least partially attributable to the Syrian Defendants. The Court takes judicial notice of its previous finding that the Syrian Defendants supported Hamas during the early 2000s and therefore supported Hamas's carrying out of the March 7, 2002 Attack.

## IV.    CONCLUSIONS OF LAW

### A. Subject Matter Jurisdiction Exists

#### 1. Original Jurisdiction Under § 1330(a)

"For the better part" of the first two centuries of our nation's existence, the Executive branch requested that courts grant immunity to foreign states involved in suits before them. *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 140 (2014). However, in 1976 Congress "replac[ed] the old executive-driven, factor-intensive, loosely common-law-based immunity regime with the Foreign Sovereign Immunities Act's ["FSIA"] 'comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state.'" *Id.* at 141 (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983)). Under the

new FSIA regime, sovereign immunity is still the default in civil actions such as this one. 28 U.S.C. § 1604 (explaining that, subject to certain exceptions, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States"). And the FSIA only bestows original jurisdiction on district courts in (1) nonjury civil actions; (2) commenced against a foreign state; (3) for claims seeking relief *in personam*; (4) where the foreign state is not entitled to immunity under sections 1605 or 1607 of the FSIA or under any applicable international agreement. 28 U.S.C. § 1330(a).

Here, the first three requirements of § 1330(a) are clearly met. First, Mr. Bluth has not asked for a jury trial in the Complaint, so this is a "nonjury civil action." *See generally* Compl. Second, both Syria and SAFI are "foreign states" within the meaning of the FSIA. The FSIA's definition of a foreign state encompasses any "political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). Recognizing that any government must act through offices and departments, the D.C. Circuit has taken a "categorial approach" in determining whether a government-related entity is a political subdivision of a foreign state for purposes of FSIA jurisdiction. *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003). "[I]f the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." *Id.* Following the D.C. Circuit's lead, this Court has found that because "[i]ntelligence gathering and conducting operations are core government functions," and because "[SAFI] is an intelligence service and serves as a conduit of Syrian funds to terrorist organizations," SAFI is a political subdivision of Syria and thus included in the FSIA's definition of a foreign state. *Roth v. Syrian Arab Republic*, No. 1:14-cv-01946-RCL, 2018 WL 4680270, at *7 (D.D.C. Sept. 28, 2018) (citations omitted).

Third, the claims are against the Syrian defendants "as legal persons," and the claims therefore seek relief *in personam*. *Id.* at *6.

The fourth prong of the § 1330(a) analysis requires the Court to consider whether a foreign state is nevertheless immune from suit under sections 1605 or 1607. The plaintiffs here seek to invoke this Court's subject matter jurisdiction based on the "terrorism exception" to sovereign immunity contained in § 1605A. For the terrorism exception to apply, the Court must first find that the statutory requirements for abrogation of sovereign immunity found in subsection 1605A(a)(1) are satisfied. And the statute directs that Courts "shall" hear claims if certain requirements are met under subsection 1605A(a)(2). For the reasons set forth below, the Court finds both that the statutory requirements for abrogation of sovereign immunity and the requirements for a claim to be heard are met here, and the Court may therefore exercise subject matter jurisdiction over the claims.

### 2. Subsection 1605A(a)(1)—Abrogation of Immunity

Subsection 1605A(a)(1) states that a foreign state "shall not be immune from the jurisdiction of the courts of the United States or of the States in any case . . . [1] in which money damages are sought [2] against a foreign state [3] for personal injury or death that was [4] caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). The Court will address each of these requirements in turn.

First, the Complaint seeks only monetary remedies for Mr. Bluth's injuries. Compl. ¶ 32. Second, as discussed *supra*, both Syrian Defendants are "foreign states" as defined by the FSIA. Third, Mr. Bluth has proved by evidence satisfactory to the Court that he suffered various personal injuries as a result of the Attack. The fourth element, causation, simply "requires some reasonable

connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Roth*, 651 F. Supp. 3d at 91. That connection is apparent here. At the time of the March 7, 2002 Attack, Syria "lent Hamas considerable support through funding, weapons, safe havens, and strategic training." Mem. Op. 8 (citing *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 71 (D.D.C. 2017)). Syria's provision of funds and weapons to Hamas at the time of the March 7, 2002 Attack has a reasonable connection to the Attack, especially considering that Syria had entered an agreement with Hamas through which Hamas promised to "carry out acts of extrajudicial killing and terrorism against Jews in Israel." *Braun*, 228 F. Supp. 3d at 71. As a Jewish person in Israel, Mr. Bluth was undoubtedly a target of Syria's proxy terror campaign during this time period.

Finally, the Court must consider whether the March 7, 2002 Attack was "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ." 28 U.S.C. § 1605A(a)(1). Two terms in this subsection are defined later in § 1605A. First, "extrajudicial killing" under the FSIA has the same meaning as it is given in Section 3 of the Torture Victim Protection Act of 1991. 28 U.S.C. § 1605A(h)(7). That section defines extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *See* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (excluding from the definition killings that are lawful under international law). Second, "material support or resources" has the same meaning as that term is given in 18 U.S.C. § 2339A. 28 U.S.C. § 1605A(h)(3). That section defines "material support or resources" to mean provision of

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert

advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

The March 7, 2002 Attack was not authorized by a previous judgment pronounced by a regularly constituted court. Instead, the vicious Attack was an extrajudicial killing that was deliberate and carried out by a terrorist with ties to Hamas, who sprayed bullets and threw grenades at random throughout the yeshiva, moving from classroom to classroom seemingly without any design other than to inflict as much chaos and death as possible. The Syrian Defendants materially supported this campaign through their provision of funds, weapons, lodging, training, and expert advice or assistance to Hamas. The final requirement for a waiver of sovereign immunity of the terrorism exception is therefore met, and the FSIA therefore abrogates Syria's and SAFI's sovereign immunity in this case.

### 3. Subsection 1605A(a)(2)—Requirements for a Claim to Be Heard

Even if the requirements of subsection 1605A(a)(1) are met, a district court still cannot exercise subject matter jurisdiction over a claim brought under the terrorism exception unless the requirements of subsection 1605A(a)(2) are also met. Namely, the requirements for a claim under the terrorism exception to be heard are that (i) the foreign country was designated a "state sponsor of terrorism at the time [of] the act," (ii) the "claimant or the victim was" a "national of the United States" at that time, and (iii) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2).

Syria has been designated a state sponsor of terrorism since December 29, 1979, so the first of these requirements is easily satisfied. U.S. DEP'T OF STATE, *State Sponsors of Terrorism*,

https://www.state.gov/state-sponsors-of-terrorism/  [https://perma.cc/77SR-UQGP];  *see also*

*Braun*, 228 F. Supp. 3d at 71; Mem. Op. 8, *Baxter II*, No. 18-cv-1078 (RCL) (D.D.C. July 19,

2022), ECF No. 48.

Turning to the second prong, the plaintiff must be a member of an enumerated class,

including "national[s] of the United States," at the time of the Attack.  The FSIA "assigns the term

'national of the United States' the 'meaning given that term in section 101(a)(22) of the

Immigration and Nationality Act' (INA), 8 U.S.C. § 1101(a)(22)."  *Mohammadi v. Islamic*

*Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015) (citing 28 U.S.C. § 1605A(h)(5)).  The INA, in

turn, defines "national of the United States" to mean either a "citizen of the United States" or a

"person who, though not a citizen of the United States, owes permanent allegiance to the United

States." 8 U.S.C. § 1101(a)(22).

Mr. Bluth's Motion for Default Judgment does not mention this requirement, much less

does it provide any evidence that Mr. Bluth is, in fact, a United States citizen.  However, the Court

has spent considerable time reviewing the record in *Bluth* and found exhibits demonstrating Mr.

Bluth's citizenship.  Specifically, Mr. Bluth's passport and birth certificate were both introduced

as exhibits on the docket of that case.  *See* Ex. List, *Bluth v. Islamic Republic of Iran*, No. 12-cv-

250 (GK) (D.D.C. Jan. 6, 2016), ECF No. 58-33.  The Court is satisfied that Mr. Bluth is a citizen

of the United States and thus eligible for relief under the private right of action found in § 1605A.

The third requirement for a claim to be heard is not relevant here as the Attack did not take

place "in the foreign state against which the claim has been brought," but rather in Israel.

Therefore, Mr. Bluth was under no obligation to afford the Syrian Defendants a reasonable

opportunity to arbitrate in the courts of Syria or any other country.

The Court finds that the requirements for a claim to be heard have been met in this case, and therefore, the terrorism exception applies. The Court will briefly address other potential statutory barriers to adjudicating this matter. After confirming that none of those barriers presents an obstacle here, the Court will proceed to its analysis of Mr. Bluth's claims under the private right of action found in subsection 1605A(c).

## B. Personal Jurisdiction Over Syrian Defendants

Courts adjudicating FSIA cases must assure themselves not only of subject matter jurisdiction but also of personal jurisdiction over the defendants. 28 U.S.C. § 1330. To exercise personal jurisdiction over a foreign defendant under the FSIA, courts must confirm that service has been properly made under § 1608 of the FSIA. *Id.* § 1330(b). Section 1608 provides four acceptable methods of service upon a foreign state or political subdivision of a foreign state:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).[6]

The Court is not aware of any special arrangement for service between these parties, and no international convention on service applies. The plaintiffs in this case—including Mr. Bluth—were thus authorized to attempt service on both Syria and Iran by mail under subsection 3. Their attempt was unsuccessful with respect to Syria, but they did succeed in serving Iran. Return of Service, ECF No. 15. As discussed *supra*, the Court severed the claims against Syria (*Baxter II*) from those against Iran (*Baxter I*) so that the claims against Iran could be adjudicated while the plaintiffs continued to attempt service of process on Syria. See Severing Order, *Baxter II*, No. 18-cv-1078 (RCL) (D.D.C. May 4, 2018), ECF No. 31. On September 23, 2014, the *Baxter II* plaintiffs unsuccessfully attempted service on Syria and SAFI by mail in accordance with § 1608(a)(3). Certificate of Mailing, *id.*, ECF No. 22. Five years later, in March 2019, they achieved service on Syria and SAFI under cover of diplomatic note pursuant to 28 U.S.C. § 1608(a)(4). Return of Service, *Baxter v. Syria*, No. No. 18-cv-1078 (RCL) (D.D.C. Mar. 12, 2019), ECF No. 39.

Although Mr. Bluth had independently pursued his own claims against Syria, by the time service was achieved in this case, he had voluntarily dismissed his independent suit against Syria in front of Judges Kessler and Friedrich, and it had been terminated from the docket. *Compare* Minute Order, *Bluth v. Syria*, No. 15-cv-665 (DLF) (D.D.C. March 4, 2018), *with* Return of Service, *Baxter v. Syria*, No. No. 18-cv-1078 (RCL) (D.D.C. Mar. 12, 2019). And although Mr. Bluth voluntarily dismissed his claims against Iran shortly after service on Syria was successfully

---

[6] Because the Court has determined that Syria is a foreign state and SAFI is a political subdivision of Syria, the Court need not consider the service provisions required for agencies or instrumentalities of a foreign state subsection 1608(b), which are less permissive than those under subsection 1608(a).

made,[7] he maintained his claims against Syria, which were included in the Complaint, throughout the pendency of this litigation. Mr. Bluth has therefore complied with the service provisions of § 1608, and the Court may exercise personal jurisdiction over the Syrian Defendants.

### C. Venue is Proper in This Court

For civil actions "against a foreign state or political subdivision thereof," venue is proper "in the United States District Court for the District of Columbia." 28 U.S.C. § 1391(f)(4). Syria is a foreign state and SAFI is a political subdivision as defined by the FSIA. *Id.* § 1603(a). Venue is therefore proper in this District.

### D. The Claims Are Timely Under Subsection 1605A(b)

Section 1605A also includes a limitations provision, at subsection (b), setting out a series of time periods within which an action under the section "may be brought or maintained." 28 U.S.C. § 1605A(b). This Court has held that § 1605A's limitations provision is not jurisdictional. *See Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 328 (D.D.C. 2014). Nonetheless, the Court will briefly explore the matter and conclude that Mr. Bluth complied with the statute of limitations.

Subsection 1605A(b) provides that an action may be brought no later than "10 years after the date on which the cause of action arose." 28 U.S.C. § 1605A(b)(2). The Attack giving rise to this action took place on March 7, 2002. Mr. Bluth's private cause of action therefore arose on that date. *Cf. Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 994 (D.C. Cir. 2014) (internal citation

---

[7] Presumably, Mr. Bluth dismissed his claims against Iran because he had already received a judgment against them for the same claims from Judge Kessler.

omitted) (holding that under District of Columbia law, the statute of limitations usually begins running when a plaintiff "sustains a tortious injury"). Mr. Bluth filed the Complaint along with all other plaintiffs in this case on November 30, 2011, less than 10 years from the date his first cause of action arose. His claims are timely under § 1605A of the FSIA.

### E. The Syrian Defendants Are Liable Under the Private Right of Action in § 1605A(c)

In addition to establishing the terrorism exception to sovereign immunity and setting a statute of limitations on claims, § 1605A also creates a federal private right of action at § 1605A(c). That right of action is available to several groups, including nationals of the United States, against state sponsors of terrorism whose acts cause personal injury or death. 28 U.S.C. § 1605A(c). If a plaintiff can establish both that (i) they are a member of an enumerated class[8] and (ii) the terrorism exception to sovereign immunity applies and the defendant's sovereign immunity is waived, the defendant "shall be liable" for injury to or death of the plaintiff caused by the defendant's actions. *Id.* But as courts in this district have repeatedly recognized, the "causation" and "injury" elements of the terrorism exception "demand that a plaintiff . . . demonstrate the culpability and liability of the defendant as a matter of law." *Rimkus* 750 F. Supp. 2d at 175. This means that plaintiffs who seek to invoke the private cause of action in § 1605A(c) "must articulate the justification for such recovery, generally through the lens of civil tort liability." *Id.* at 176. However, the statute provides no guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages under the private cause of action. Consequently, courts have applied "general principles of tort law," such as the Restatement (Second) of Torts, to determine an appropriate theory of

---

[8] Specifically, a plaintiff must be "a national of the United States, . . . a member of the armed forces, . . . an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or . . . the legal representative" of one of those categories of persons. 28 U.S.C. § 1605A(c).

liability. *Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012)).

Battery and IIED provide the applicable principles of tort law for Mr. Bluth's injuries. The Syrian Defendants are liable for battery if, when providing Hamas with the material support and resources for the March 7, 2002 Attack, they (i) "intended to cause a harmful or offensive contact . . . or an imminent apprehension of such contact"; and (ii) a harmful or offensive contact "directly or indirectly result[ed]." *Valore*, 700 F. Supp. 2d at 77 (citing RESTATEMENT (SECOND) OF TORTS § 13). The record in the case indicates that the second element is met because a harmful contact occurred when Mr. Bluth was hit by the shrapnel blast of the grenade. Mr. Bluth alleges "pain, suffering, trauma, mental anguish and extreme emotional distress." Compl. ¶ 32. As Judge Kessler found and this Court has reiterated *supra*, Mr. Bluth has suffered tremendously on account of the horrific events at the yeshiva. The Attack caused serious bodily injury to Mr. Bluth, for which he required multiple surgeries and over a week of hospitalization. He has therefore suffered "harmful contact."

Determining the intent of a foreign state is a trickier task, but it is a task this Court and many others have repeatedly handled in FSIA cases. The Court will first reiterate that "acts of terrorism are, by their very nature intended to harm and to terrify by instilling fear of such harm." *Bluth*, 203 F. Supp. 3d at 21 (quoting *Valore*, 700 F. Supp. 2d at 76–77). And as the Court has already found, Syria had an agreement with Hamas in place at the time of the Attack through which Hamas promised to "carry out acts of extrajudicial killing and terrorism against Jews in Israel." *Braun*, 228 F. Supp. 3d at 71. This agreement evinces a clear intent on Syria's part to "cause a harmful or offensive contact." Accordingly, the Court finds that the elements of battery are met here, and the Syrian Defendants are liable to Mr. Bluth for battery.

The Syrian Defendants are liable for IIED if they, "by extreme and outrageous conduct[,] intentionally or recklessly cause[d] severe emotional distress to" Mr. Bluth. RESTATEMENT (SECOND) OF TORTS § 46(1). Mr. Bluth has already alleged in the Complaint that he suffered "extreme emotional distress." Compl. ¶ 32. As this Court has recognized, "[a]ll acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience: The more extreme and outrageous, the greater the resulting distress." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002). And Mr. Bluth has proved that he has experienced—indeed, he continues to experience to this day—extreme emotional distress including "flashbacks," "nightmares," and "paranoia of loud noises." Mot. for Def. J. 11; *see also Bluth*, 203 F. Supp. 3d at 21. The Court finds that the Syrian Defendants are liable to Mr. Bluth for IIED.

## V.    DAMAGES

When a plaintiff is successful in proving their claims under § 1605A(c), the damages available to them "may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). After holding an evidentiary hearing in *Bluth*, Judge Kessler determined that there was sufficient evidence to "establish that the pain and suffering Nethaniel experienced during and since the Attack was a reasonably certain consequence of Defendant's acts." *Bluth*, 203 F. Supp. 3d at 23. Judge Kessler awarded Mr. Bluth $6 million in compensatory damages.

Mr. Bluth argues that "[j]ust as this Court may take Judicial Notice as [sic] the Findings of Fact and Conclusions of Law which establish the liability of the Syrian Defendants, the Court may also take judicial notice and adopt the previous findings in Bluth/Iran as to Nethaniel Bluth's damages." Mot. for Default J. 10. But this is not exactly right. As mentioned above, the taking

of judicial notice in FSIA cases allows courts to acknowledge the existence of and consider the evidentiary record created through hearings, affidavits, and other evidence presented in litigation arising from similar matters in order "to reach their own, independent findings of fact in the cases before them." *Rimkus*, 750 F. Supp. 2d at 172. Here, the Court may take notice of the evidentiary record in the *Bluth* case in order to aid its own fact-finding mission. But Mr. Bluth asks the Court to go even further by simply accepting the *Bluth* record as truth. This the Court cannot do.

A court taking judicial notice of another court's fact findings "generally cannot take notice of findings of fact from other proceedings for the truth asserted therein because these are disputable and usually are disputed." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58 (D.D.C. 2010) (Lamberth, C.J.) (citations omitted). In other words, the reason courts are able to make factual findings with "absolute certainty" in our judicial system is because the adversarial process sharpens the issues so that courts may see all sides of factual disputes. *Id.* This Court has stated that accepting the truth of factual findings of another court "is not prohibited per se, but is inappropriate absent some particular indicia of indisputability." *Id.* Where, as here, defendants fail to enter an appearance, courts making factual findings do not have the "full benefits of adversarial litigation" and thus should not assume the truth of the fact findings of a sister court. *Id.* at 59. And because "[a] court's award of damages is a finding of fact," this Court will not blindly accept the truth of the factual findings in *Bluth* and enter the same damages award as Judge Kessler.

Mr. Bluth has not submitted any information or evidence to this court regarding his damages. The Court sympathizes with his situation, but it cannot award him the compensatory and punitive damages he seeks without evidence of those damages. Especially because he chose to join this lawsuit with dozens of other plaintiffs, an award of damages based solely on judicial

notice of Judge Kessler's findings would give Mr. Bluth relief before relief is granted to his co-plaintiffs, who continue to work with a special master to submit evidence as to their damages. This would, in turn, perversely reward Mr. Bluth for filing simultaneous lawsuits with two different judges in this court. The other plaintiffs in this case are having their damages claims reviewed by the Special Master in this case, Alan Balaran. Because Mr. Bluth chose to join those plaintiffs in this case, the Court will refer his case to the Special Master to consider along with all the other plaintiffs.

## VI.    CONCLUSION

The act of terrorism that gave rise to Mr. Bluth's claims was horrific. The targeting of students and teachers at a yeshiva in Israel and the use of deadly force to create as much havoc and death as possible show the extreme lengths to which Hamas will go to carry out its evil ends. Mr. Bluth has proved that both Iran and Syria were responsible for the injuries he suffered. This Court will hold Syria liable for its role in the Attack and **GRANT** Mr. Bluth's Motion for Default Judgment.

However, for whatever reason, Mr. Bluth and his attorneys made the decision to file separate lawsuits for the injuries arising from this Attack, which resulted in simultaneous cases taking place before this Court and before Judge Kessler. While that may have resulted in relief from Judge Kessler against Iran, this Court will not allow Mr. Bluth's procedural maneuvering to grant him relief before the damages of his co-plaintiffs are calculated. To do so would reward his questionable behavior and let him jump the line in receiving a damages award from this Court.

For that reason, Mr. Bluth's damages calculation is hereby **REFERRED** to Special Master

Alan Balaran to be calculated along with the rest of his co-plaintiffs in a timely manner.

An Order and Judgment consistent with this Memorandum Opinion shall issue.


Date: ___3___ March, 2025

Royce C. Lamberth
United States District Judge