## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————

WILLIAM "JACK" BAXTER et al.    )
    )
    )
    Plaintiffs,    )
    )
v.    )    **Case No. 11-cv-2133 (RCL)**
    )
ISLAMIC REPUBLIC OF IRAN et al.    )
    )
    Defendants.    )
———————————————————)

———————————————————

WILLIAM "JACK" BAXTER et al.    )
    )
    Plaintiffs,    )
    )
v.    )    **Case No. 18-cv-1078 (RCL)**
    )
SYRIAN ARAB REPUBLIC et al.    )
    )
    Defendants.    )
———————————————————)

———————————————————

BARUCH TRATNER et al.    )
    )
    Plaintiffs,    )
    )
v.    )    **Case No. 18-cv-2971 (RCL)**
    )
ISLAMIC REPUBLIC OF IRAN et al.    )
    )
    Defendants.    )
———————————————————)

## RESPONSE TO PLAINTIFFS' REQUEST FOR RECONSIDERATION OF THE SPECIAL MASTER'S REPORTS AND RECOMMENDATIONS

## BACKGROUND

On March 15, 20, and 21, 2024, the Special Master filed 138 Reports and Recommendations in the related cases, *Baxter v. Islamic Republic of Iran*, No. 11-cv-2133 ("Baxter" or "BX") and *Tratner v. Islamic Republic of Iran*, No. 18-cv-2971 ("Tratner" or "TR"), addressing the compensatory claims of the Estate of David Applebaum, the Estate of Naava Applebaum, Debra Applebaum, Nosson ("Natan") Applebaum, Yitzhak Applebaum, Shira Applebaum Maresky, Shayna Applebaum Abramson, Tovibelle Applebaum Kalker, and the Estate of Jacqueline Applebaum ("Applebaum Plaintiffs") (BX ECF No. 56); William "Jack" Baxter and Fran Strauss-Baxter ( "Baxter Plaintiffs") (BX ECF No. 57); Ronald Cantrell (BX ECF No. 58); Chaya Tziporah Cohen (BX ECF No. 59); Ariela Freimark, Hadassah Freimark, and Menachem Freimark ("Freimark Plaintiffs") (BX ECF No. 60); Avraham Grossman (BX ECF No. 61); the Estate of Elnatan ("Eli") Horovitz, the Estate of Debra Horovitz, Batsheva Sadan, Zvi Horovitz, Shulamit Nachman, Nechama Tau, the Estate of Lillian Horovitz, the Estate of Moshe Horovitz, Tova Naiman, Ahron Horovitz, David Horovitz, Uri Horovitz, the Estate Of Bernice Wolf, Stanely Wolf, and the Estate of Bryan Wolf ("Horovitz Plaintiffs") (BX ECF No. 62); Joseph Leifer and Devorah Checkanow Leifer (the "Leifer Plaintiffs") (BX ECF No. 63); Philip Litle, Heidi Litle, Josiah Litle, Hannah Litle, Elishua Litle, Noah Litle, and the Estate of Abigail Litle ("Litle Plaintiffs") (BX ECF No. 64); Moshe Naimi (BX ECF No. 65); Rachel Potolsky, Ovadya Toporowitch, Tehilla Toporowitch Greineman, Yisrael Toporowitch, and Yitzchok Toporowitch ("Nathansen Plaintiffs") (BX ECF No. 66); the Estate of Mordchai Reinitz, the Estate of Yessucher Dov Reinitz, Menachem Reinitz, Malka Chaya Reinitz, Benjamin Reinitz, Chaim Reinitz, Devora Pollack, the Estate of Joseph Reinitz, Helen Wieder, Leah Tauber, Leibel Reinitz, Malvina Reinitz, Margolith Reinitz Waxberger, Miriam Reinitz

Binder, Miriam Ehrenfeld, Necha Reinitz Ostreicher, the Estate of Raizel Shimon, Rivka Reinitz

Wiesel, the Estate Of Rose Joseph, Samuel Reinitz, Shmuel Reinitz, Yaacov Reinitz, and

Yitzchak Reinitz ("Reinitz Plaintiffs") (BX ECF No. 67); Miriam Richter Grinblat, Avraham D.

Richter, Breina Richter, Moshe Dov Richter, Nechama Richter, Sarah Richter Green, Shlomo

Chaim Richter, Trane Richter, Yaakov Yosef Richter, Yechiel Richter, Yehudis Richter, Yisroel

Richter, and Yitzchok Richter ("Richter Plaintiffs") (BX ECF No. 68); Erik Schecter (BX ECF

No. 69); the Estate of Bertin Tita, the Estate of Ephraim Tita, Ezra Tita, and Shoshana Tita (

"Tita Plaintiffs") (BX ECF No. 70); and Obadiah Waxler, Chana Waxler, Arthur Waxler, Dina

Waxler, Abraham Waxler, Baruch Waxler, Bracha Milstein, Chaya Rosenberg, Ezekiel Waxler,

Gedaliah Waxler, Haggai Waxler, Nachum Waxler, Shifra Miller, Yoel Waxler, Yaakov Waxler,

and Zacharia Waxler ("Waxler Plaintiffs") (BX ECF No. 71); the Estate of Goldy Zarkowsky,

the Estate of Eli Zarkowsky, Bshava Zarkowsky Richter, Abraham Zarkowsky, Aharon

Zarkowsky, Chaya Freisel Felberbaum, Elizabeth Schwartz, Ester Buxbaum, Ezriel Zarkowsky,

Gitel Cohen, Gittel Silber, Jacob Schwartz, Joseph Zarkowsky, Malka Breuer, Max Schwartz,

Mendel Zarkowsky, Michael Schwartz, Miriam Zarkowsky Felberbaum, Perl Brailofsky, Philip

Schwartz, Rachel Rosner, Shrage Zarkowsky, Trany Zarkowsky, and Yehuda Zarkowsky

("Zarkowsky Plaintiffs") (ECF No. 72); Rivka Wolfson Pam and Phyllis Pam ("Pam Plaintiffs")

(BX ECF No. 73); Nathan Pam, Raziel Pam, and Neemah Pam Fisher ("Pam II Plaintiffs") (TR

ECF No. 30); Baruch Tratner, Drora Wizner, Belka Gez, Judit Tratner, and Rivka Selzer

("Tratner Plaintiffs") (TR ECF No. 31).

On May 19, 2023, plaintiffs sought reconsideration of the Special Master's Report and

Recommendations under Fed. R. Civ. P. 53(f)(2). Specifically, plaintiffs object to the Special

Master's monetary recommendations for Shayna Applebaum Abramson, William "Jack" Baxter,

Uri Horovitz, Zvi Horovitz, Hanah Litle, Noah Litle, Nathan Pam, Leah Tauber Reinitz, Samuel Reinitz, Yaacov Reinitz, Yitzchok Reinitz, the Estate of Goldie Zarkowsky, Shrage Zarkowsky, and Yehuda Zarkowsky. Plaintiffs also note several "scrivener errors," which, with one exception, impact none of the final monetary recommendations.

The Special Master will address each objection in turn.

### SHAYNA APPLEBAUM ABRAMSON

In the Report and Recommendation of Special Master re: the Applebaum Plaintiffs ("Applebaum Rep."), the Special Master recommended Shayna Applebaum Abramson receive $3,750,000 in damages for loss of solatium arising following the deaths of her father, Dr. David Applebaum, and sister, Naava Applebaum in a terrorist attack in Israel on September 9, 2003. Applebaum Rep. at 32–33. The proposed award represented a 25% enhancement above the *Heiser* and *Davis* formulations, prompted by the particularly heinous circumstances surrounding the terrorist attack.

Plaintiffs challenge that recommendation, arguing that the letter supplied by Shayna's clinical social worker and psychotherapist, Shanny Blumberg Zvi, stating that "Shayna suffers from a 'severe sense of loss,' trauma and depression resulting from the terror attack in which her father and sister were murdered," constitutes medical corroboration of Shayna's "severe pain, grief, or suffering" warranting an additional enhancement of 25%.

The Special Master disagrees.

*First*, Ms. Blumberg Zvi's letter focuses on Shayna's subjective grief over losing two family members and offers no formal diagnosis of Shayna's psychological state.

*Second*, notwithstanding Shayna's understandable "severe pain, grief, or suffering," Shayna sought no psychological assistance until September 2019—16 years *after* the tragic

events of September 9, 2003.  This considerable gap leaves opens the distinct possibility that Shayna's emotional state, when assessed by Ms. Blumberg Zvi, is related to numerous intervening events.

*Third*, Ms. Blumberg Zvi's letter suggests that much of Shayna's emotional state stems from issues related to post-partum difficulties and not from the terrorist attack.

*Fourth*, There is no precedent for a 25% enhancement based solely on a mental health professional's regurgitation of a claimant's statements made in furtherance of a damages award.

By way of context, the Special Master invites plaintiffs to compare the "medical proof" supplied by Shayna Abramson to that offered up by Zvi Horovitz, who met with a therapist twice daily since 2004 and was diagnosed with PTSD, "depression, anxiety, and social dysfunction." Horovitz Rep. at 13.

The Special Master recommends Shayna Applebaum Abramson's objection to the Special Master's monetary recommendation be rejected.

### WILLIAM "JACK" BAXTER

In the Report and Recommendation of the Special Master re: the Baxter Plaintiffs ("Baxter Rep."), the Special Master recommended economic damages of $467,375—an amount commensurate with the CFES's proposal.  Plaintiffs correctly observe that the recommended amount failed to incorporate the CFES's calculation of lost household services, estimated to range between $9,980 to $214,084.  Plaintiffs are also correct that, in the context of 1605A, courts consider lost household services ("LHS") to be recoverable economic damages.  *See Opati v. Repub. of Sudan*, 60 F. Supp.  3d 68 (D.D.C. 2014) and *M.M. v. Islamic Republic of Iran*, 21-cv-2783 (TNM), 2023 WL 8867943, at *11 (D.D.C. Dec. 22, 2023).  One objective way to quantify the loss of household services, which include a variety of routine, everyday chores and

tasks, is by calculating "the cost of employing someone else to perform those domestic services" after the injured party's disability. *Cruz v. Hendy Int'l Co*., 638 F.2d 719, 723 (11th Cir. 1981).

The Special Master takes no issue with the logic of this precedent or its theoretical underpinnings. The Special Master is, however, troubled by the wholesale lack of corroborative evidence the Baxters have brought to bear.

In support of their LHS recommendations, the CFES Report states only that,

Since the incident, it has been expressed to us that Mrs. Strauss [Jack Baxter's spouse] has hired someone to help perform the typical household projects that Mr. Baxter formerly would assist with. Additionally, since the incident, Mr. Baxter is easily distracted from chores and projects, which leads to those tasks taking longer to complete, if he completes them at all. Mr. Baxter is able to care for his pets as well as perform most of the household's cooking.

CFES Rep. at 7 (emphasis added).

According to Fran, before the April 30, 2003 terrorist attack, Jack was "able to help out around the house with chores such as vacuuming, taking out garbage, cleaning the cat litter, and cleaning windows." *Id*. Afterward, the family had to retain "individuals contracted with as substitutes," for which compensation is sought. *Id*.

While facially compelling, the testimonies of Jack Baxter and Fran Strauss fall short of the evidentiary threshold needed to support an award for pecuniary damages. Plaintiffs have not only failed to quantify their purported damages, but they have supplied no supporting documentation such as sales slips, invoices, receipts, bank statements, canceled checks, or proof of transferred electronic funds. Faced with a similar dearth of evidence, courts consistently have denied claims for economic losses. In *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 40 (D.D.C. 2016), for example, the court refused a plaintiff's request to be reimbursed for stolen tools and expenses "where no receipts verifying the value of the stolen tools or for the expenses the family incurred during their time away from home." Again, in *Wyatt v. Syrian Arab Republic*, 908 F.

Supp. 2d 216 (D.D.C. 2012), the court denied plaintiffs' request for medical costs, which lacked "any evidence of what costs specifically were incurred," and "travel expenses," which lacked "any evidence supporting this claim." *Id.* at 230.

In light of the Baxters' "fail[ure]to meet the minimum evidentiary threshold supporting their respective claims for economic damages," *Kaplan*, 213 F. Supp. 3d at 41, the Special Master recommends plaintiffs' objections to the Special Master's denial of lost household services expenses be rejected.

### URI HOROVITZ

In the Report and Recommendation of the Special Master re: the Horovitz Plaintiffs ("Horovitz Rep."), the Special Master recommended Uri Horovitz receive a $2.5 million solatium award—the baseline award adopted in *Davis*, unlike Shulamit Nachman, Batsheva Sadan, Nechama Tau, and Zvi Horovitz, who provided "medical proof" evidencing "severe pain, grief or suffering," *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 403 (D.D.C. 2015), and for whom the Special Master recommended a 25% enhancement.

Plaintiffs object to the Special Master's denial of an enhancement for Uri, citing the December 9, 2020 letter from Tzippy Solomon, Uri's clinical social worker and psychotherapist since 2003, stating that Uri "still experiences anxiety attacks, nightmares, and outbursts of depression," resulting from the terror attack. Plaintiffs maintain Ms. Solomon's letter constitutes the necessary medical corroboration of "severe pain, grief, or suffering" supportive of an enhancement. The Special Master agrees, given Ms. Solomon's long-term relationship with Uri, and recommends Uri Horovitz receive $3,125,000—representing an enhancement of 25% to his $2,500,000 previously recommended award.

Plaintiffs object to the Special Master's denial of an enhancement, arguing that the December 9, 2020 letter from Tzippy Solomon, Uri's clinical social worker and psychotherapist since 2003, stating that Uri "still experiences anxiety attacks, nightmares, and outbursts of depression," resulting from the terror attack, constitutes the necessary medical corroboration of "severe pain, grief, or suffering" supportive of an enhancement. The Special Master agrees, given Ms. Solomon's long-term relationship with Uri, and recommends Uri Horovitz receive $3,125,000—representing an enhancement of 25% to his $2,500,000 previously recommended award.

### ZVI HOROVITZ

In the Report and Recommendation of the Special Master re: the Horovitz Plaintiffs ("Horovitz Rep."), the Special Master adopted the financial damages calculations of the CFES and recommended Zvi Horovitz receive $2,309,056 in pecuniary damages. Basing its valuation on information supplied by Dr. Mann-Shalvi, who opined that Zvi's condition requires therapy sessions "indefinitely into the future and for two hours per week" at a cost of 600 NIS ($186) per hour, increasing at 1.5% per annum, the CFES calculated therapy costs for one year (63,320 NIS or $9,629), for twenty years (1,231,692 NIS or $381,825), or forty years (2,115,170 NIS or $655,703), based on Zvi's statistical life expectancy—age 84.7 in 2061. Plaintiffs observe that the Special Master failed to include the costs of Zvi's potential future therapy outlays, which the CFES estimated to range from $19,629 to $655,703.

Plaintiffs are correct; Zvi Horovitz's future therapy costs are compensable. Precedent supports the compensability of economic damages for future mental health treatment arising out of injuries sustained from an FSIA claim. *See Saberi v. Gov't of Islamic Republic of Iran*, 541 F. Supp. 3d 67, 86 (D.D.C. 2021); *Khosravi v. Gov't of Islamic Republic of Iran*, 16-cv-02066-

TSC, 2020 WL 4923495, at *7 (D.D.C. Aug. 21, 2020) (awarding future costs "for medical and mental health treatment"). In calculating a revised recommended amount incorporating these future costs, the Special Master will follow the example set in *Saberi* and recommend Zvi Horovitz receive $381,825 for future therapy costs—representing somewhat of a "midpoint" of the damages range proposed by the CFES—for a total economic award of $2,690,881 (reflecting $2,309,056 previously recommended + $381,825(future therapy costs)).

### **HANNAH LITLE**

In the Report and Recommendation of the Special Master re: the Litle Plaintiffs ("Litle Rep."), the Special Master rejected forensic findings of the CFES report—estimating Hannah Litle's financial losses to fall between $2,043,788 and $2,245,971—and recommended her claim for economic damages be denied. The Special Master's decision was based on the inchoate nature of her claim and the discrepancies between her representations and the record. Litle Report at 61–64.

Plaintiffs challenge that recommendation by introducing new "supporting evidence" they maintain constitutes "additional support to substantiate the assumptions" upon which the CFES based its findings and which "further proves . . . a causal connection" between the murder of Hannah's sister, Abigail, and Hannah's emotional injuries, purportedly giving rise to her prayer for economic relief. This evidence consists of Hannah's Second Supplemental Declaration dated May 6, 2024 ("HL 2d Supp. Decl."), a letter dated April 2024 captioned "Hannah Litle-Psychological therapy" drafted by Adi Sella Bar-Oz ("Bar-Oz Ltr."), a self-described "expert clinical psychologist and certified instructor," and an updated CFES report dated May 8, 2024, incorporating Ms. Bar-Oz's opinions.

In this augmented record, Hannah testifies:

> Although I have tried to make advances in my personal life since 2021, when I provided my Supplemental Declaration, I continue to find it impossible to find footing in any professional or educational setting. Although I have tried to pursue different careers and obtain educational credentials, I have not been able to work, nor have I completed any degree.

HL 2d Supp. Decl. at ¶ 3.

Ms. Bar-Oz, who began seeing Hannah professionally in June 2022—19 years after the March 3, 2003 Attack, provided a letter containing detailed psychological insights touching on Hannah's mental state, which she maintains "has seriously impaired Hannah's functioning, and it deteriorated until she finally left her last job . . . and has not been able to return to work since." Bar-Oz Ltr. at 1.

The Special Master finds reconsideration unwarranted. Despite its level of detail, Ms. Bar-Oz's letter would have been considerably more persuasive had it been accompanied by contemporaneous notes of her numerous sessions with Hannah or written in a therapeutic or clinical environment and not in direct response to a recommendation to deny pecuniary damages. Neither the Second Supplemental Declaration nor Ms. Bar-Oz's letter resolves the Special Master's concerns. They fail to reconcile discrepancies between Hannah's statements and her history following the terror attack, such as (1) Hannah's successful completion of a tour of duty in the Israeli Defense Forces, where she passed stringent psychological examinations, was issued an assault rifle, and rose in the ranks, (2) Hannah's stated inability to complete her undergraduate studies despite never having enrolled in an undergraduate program, and (3) Hannah's ability to maintain an "A" average in class and with an eye toward applying to elite colleges in the U.S. or U.K.

As these issues remain unresolved, the Special Master recommends Hannah Litle's request for reconsideration be denied.

**NOAH LITLE**

In the Report and Recommendation of the Special Master re: the Litle Plaintiffs ("Litle Rep."), the Special Master rejected the CFES's pecuniary damage calculation of $462,892, not for any methodological errors but for its misplaced reliance on the unsupported assertions that, but for the loss of Abigail Litle, Noah would have enrolled in college at an early age and pursued an advanced degree. The Special Master was troubled by (1) the lack of evidence linking Noah's enrollment in college at age 26—16 years after the March 5 Attack that resulted in the death of his sister—and any purported pecuniary losses; (2) discrepancies between emails suggesting Noah "started missing school because of lack of interest" and assertions that the cause was directly related to Abigail Litle's death; (3) the lack of any statement in Dr. Rael Strous's Psychological Evaluation tying Abigail's death to Noah's college enrollment at age 26; and (4) and the speculative nature of Noah's "conviction" that he would have pursued a master's or Ph.D.—degrees he has never attained—at a younger age. Litle Rep. at 65.

Noah Litle objects to the Special Master's recommendation, supplying "new evidence" in the form of a Second Supplemental Declaration ("NL 2nd Supp. Decl.") coupled with a letter from Elit Yehuda—a clinical psychologist with a Bachelor of Science degree in psychology and several certificates in related fields ("Yehuda Let."). In his latest declaration, Noah maintains that, since "undergoing therapy" with Ms. Yehuda, "it became apparent that [he] never properly dealt with the trauma [] suffered as a result of [his] sister's murder" and that "[f]or years, [he] was unable to recognize how [his] trauma was interfering with [his] professional and educational development." Through these sessions, Noah apparently discovered the "trauma [he] suffered as a result of [his] sister's murder has caused serious delays in [his] educational progress and caused [him] to attend college later than [he] would have otherwise." NL 2nd Supp. Decl. at ¶¶

3, 4. Finally, counsel maintains Noah has recently "begun medication with antidepressants and anxiolytics."

Ms. Yehuda's letter confirms her meeting with Noah for "two and a half years" beginning in October 2021 and sets out her opinion that Abigail's death was an emotionally traumatizing experience that "currently expressed in low mood, anxiety, doubts, and severe self-criticism, difficulty meeting academic and occupational demands due to avoidance patterns, a tendency to isolate as a way to guard against stress, and difficulties in interpersonal communication." Yehuda Ltr. at 3. In Ms. Yehuda's professional opinion, "[t]he trauma Noah suffered as a result of his sister Abigail's murder was a leading cause of Noah's delays in education" and "continues to hinder his progress both in school and his efforts to enter the workforce." *Id.* at 3–4.

The Special Master finds these submissions inadequate to meet the exacting criteria required for awarding financial damages. Those criteria are set out in considerable detail in the Litle Report and will not be repeated here. Litle Rep. at 52–57. Beyond this, the Special Master believes that, as with Hannah Litle, Noah Litle would have been better served had Ms. Yehuda included contemporaneous notes of her sessions describing how the tragic events of March 5, 2003 stalled Noah's academic progress and hindered his employment prospects and financial situation. Raising these issues in an opinion drafted 21 years after the underlying incident and in direct response to recommendations in the Litle Report merits no reconsideration. Noah's Second Amended Declaration similarly adds little to the calculus, constituting little more than a synopsis of Ms. Yehuda's observations. Finally, the unsupported assertion that Noah "[i]n recent months [] has begun medication with antidepressants and anxiolytics"—yet to be identified—

only calls into question the absence of any statements, notes, or medical records from the prescribing physician.

The Special Master recommends Noah Litle's claim for financial compensation be denied.

**RIVKA REINITZ WIESEL**

In the Report and Recommendation of the Special Master re: the Reinitz Plaintiffs ("Reinitz Rep."), the Special Master rejected Rivka's prayer for economic relief, finding it grounded on uncorroborated assumptions and speculative projections. Specifically, the Special Master found (1) the submission by Rivka's tax advisor lacking evidentiary support; (2) the CFES's calculations linking Rivka's emotional state following the August 19 Attack to her stated inability to pursue an academic degree or sustain an ongoing business, to be based on unsupported assumptions; and (3) Dr. Leonid' letter of April 3, 2022, being little more than a regurgitation of Rivka's testimony and lacking any independent medical corroboration. Reinitz Rep. at 99–100.

Plaintiffs object to this finding, pressing the position that both the statement offered by Rivka's tax advisor tying Rivka's trauma to her inability to succeed in business "to the fact that her family was injured in a terrorist attack" coupled with the opinion offered by Dr. Leonid that Rivka's financial difficulties stem from the April 19 Attack, constitute sufficient corroboration warranting a pecuniary award.

The Special Master disagrees. The speculations of a tax advisor do not constitute the necessary medical evidence to support a nexus between Rivka's trauma and her stated inability to succeed commercially. Dr. Leonid's opinion is similarly suspect as it rests on a single consultation taking place almost 20 years after the 2003 attack, which, in substance, repeats

statements made in Rivka's Declaration.  The Special Master recommends Rivka Reinitz

Wiesel's claim for pecuniary relief be denied.

**SAMUEL REINITZ**

In the Report and Recommendation of the Special Master re: the Reinitz Plaintiffs

("Reinitz Rep."), the Special Master denied Samuel's prayer for economic relief, finding it

grounded on the uncorroborated and speculative projections of attorney Natan Rosenwasser, who

"confirm[ed]" that Samuel should have earned the industry standard salary of NIS 40,000 per

month based on his expertise as an attorney specializing in the "initiation and development of

real estate property."  Reinitz Rep. at 100–101.

Plaintiffs object to the Special Master's decision, supplementing the record with a March

29, 2024 letter from Arie Samareli, a lawyer who has rendered services to Samuel's company for

more than "a decade."  According to Mr. Samareli, Samuel's salary is below that of managers of

comparable real estate companies and "lower than the one he deserves"—a situation Mr.

Samareli attributes directly to Samuel's "severe case of post-trauma" following the August 19,

2003 suicide bombing which claimed the life of his father and brother.  Mr. Samareli suggests

that Samuel's post-trauma has compromised "his bargaining capabilities with his employers who

are aware of his mental issues and thus refused to pay him the common salary offered to a person

who does not suffer from such issues."

Plaintiffs' position is unavailing as its submissions fail to address the seminal problem

identified in the Reinitz Report.  While Natan Rosenwasser and Arie Samareli may be qualified

to opine on the average salary range of real estate managers, neither possess the expertise to offer

the necessary medical evidence linking the 2003 terror attack to Samuel's diminutive salary or

reduced financial prospects.  Absent proof establishing such a nexus, Samuel's claim must fail as a matter of law.  Reinitz Rep. at 83–88.

The Special Master recommends Samuel Reinitz's request for reconsideration be denied.

## YAACOV REINITZ

In the Report and Recommendation of the Special Master re: the Reinitz Plaintiffs ("Reinitz Rep."), the Special Master recommended Yaacov Reinitz receive $143,169 in economic damages—the losses calculated by the CFES, which were grounded in the report of Dr. Frankel Yekaterina, who diagnosed Yaacov with Post-traumatic Stress Disorder.

Plaintiffs object to the Special Master's recommendation and introduce "new evidence" they believe "clearly impacts the economic award"—evidence consisting of Yaacov's supplemental declaration ("YR-Supp.-Decl.") attesting to his deteriorating mental state and his unemployment status and a medical summary from psychiatrist Dr. Yekaterina Nelson, dated August 17, 2023, diagnosing Yaacov with Schizophrenia, Post Traumatic Stress Disorder, and Obsessive Compulsive Disorder, conditions she claims are a "clear result" of the terror attack. Plaintiffs have also supplied a second supplemental report prepared by the CFES ("CFES-2d Supp.-Rep."), factoring in "the supplemental declaration of Yaacov Reinitz" and the August 17, 2023 report of Dr. Yekaterina Nelson, and "update[ing] and replace[ing]" its earlier projections. CFES-2d Supp.-Rep. at 1, 2.  Based on these additional sources, the CFES estimates Yaacov's economic losses to range from $1,178,342 to $1,226,116.  *Id*. at 6.

In considering plaintiffs' recent submissions, the Special Master is mindful that incorporating new evidence after a report and recommendation has issued risks effectively rendering "all of the proceedings before Special Master wholly redundant."  *Kaplan*, 213 F.

Supp. at 43. Despite this caveat, the Special Master agrees with plaintiffs that the original monetary recommendation be revisited.

The Special Master makes this finding in light of the steep decline in Yaacov Reinitz's condition. By letter dated April 12, 2022 ("AFV-Let."), Dr. Avituv Frankel Yekaterina indicates that Yaacov exhibited "no psychotic or major effective symptoms" at the time. AFV-Let. at 3. Less than one year later, Dr. Nelson issued her report ("YN-Rep.") diagnosing Yaacov with Schizophrenia, Post-Traumatic Stress Disorder, and Obsessive Compulsive Disorder. YN-Rep. at 2. Given these findings, Yaacov's difficulty securing employment is not surprising. And while earlier assessment exposed a rash of mental complications, it is doubtful counsel could have discerned the speed and degree of Yaacov's downward trajectory. When deciding on an actual award, the Special Master is inclined to recommend the lower end of the range proposed by plaintiffs, given Dr. Yekaterina's statement that one cause of Yaacov's emotional distress is the "worsening of the security situation in Israel." AFV-Let. at 3.

Given these developments, the Special Master recommends Yaacov Reinitz receive $1,178,342 in pecuniary damages.

## YITZCHAK REINITZ

In the Report and Recommendation of the Special Master re: the Reinitz Plaintiffs ("Reinitz Rep."), the Special Master recommended Yitzchak's prayer for economic damages be denied, finding the "facts" underlying his projected losses unsupported, speculative, and lacking foundational prerequisites. Among those unsupported conclusions was that, but for the terror attack, Yitzchak (1) would have completed his yeshiva studies in three and not five years, (2) would not have dropped out of rabbinical school, and (3) would have secured employment as a City Rabbi by July 1, 2011. Reinitz Rep. at 103.

Plaintiffs object, insisting "[t]here is no reason to believe [Yitzchak] would not have become a Rabbi or a rabbinical Judge absent the August 19th terrorist attack," pointing to Yitzchak's (1) completion of a high-school education, (2) matriculation at Kollel Sanz—a three-year program that took him five years to complete, and (3) enrollment at a Rabbanut, a three-year advanced theological educational program—one he left "barely halfway through the program." They maintain the August 19, 2003 suicide bombing was responsible for Yitzchak's Obsessive Compulsive Disorder ("OCD") and bowel obstruction, which rendered him unable to complete his studies in a timely fashion and achieve the rabbinate position he sought and which resulted in his financial hardships.

This chain of events finds little objective support in the record.

The Special Master neither doubts Yitzchak's stated rabbinical aspirations nor his profound psychological distress following the tragic events of August 19—a terror attack that claimed the lives of his father and brother. Indeed, in the context of damages for loss of solatium, the Special Master considered and credited Yitzchak Reinitz's OCD and debilitating gastrointestinal issues and recommended he receive a 25% enhancement to the solatium baseline articulated in *Davis*.

That said, the quantum of proof required to ground a claim for lost solatium, without more, cannot support a claim for pecuniary damages. As detailed in the Reinitz Report, lost earning capacity claims arising out of emotional trauma must be based upon a medical foundation, requiring an expert diagnosis of a mental condition in addition to expert testimony demonstrating to a reasonable degree of certainty a nexus between diagnosed trauma and the alleged financial impediments. Reinitz Rep. at 85–88. The need for specialized knowledge to establish this nexus is underscored by the fact that emotional traumas such as Yitzchak's OCD

can manifest in countless ways depending on factors such as preconditions, the severity of the trauma, medications, therapy, and so on.  The absence of "medical evidence" confirming a connection between Yitzchak's afflictions and his stalled academic career and diminished employment prospects constrains a finding that Yitzchak has not met his evidentiary burden. The Special Master, therefore recommends Yitzchak Reinitz's request for reconsideration be denied.

### LEAH TAUBER (REINITZ)

In the Report and Recommendation of the Special Master re: the Reinitz Plaintiffs ("Reinitz Rep."), the Special Master recommended denying Leah's request for financial compensation, finding her claim lacked the necessary evidentiary foundation.  Specifically, the Special Master found Dr. Wexler's diagnosis of PTSD based not on any objective measurement but on Leah's statements she made in support of her financial claim.

Plaintiffs object to the Special Master's recommendation, arguing that,

- "there is more than sufficient evidence that has been submitted to causally connect the murder of Leah's father and brother to her claimed economic damages" and thus "no reason to discount the opinions of Dr. Wexler a licensed psychiatrist";

- "when dealing with psychological and other medical professions, a lot of the information obtained from the therapist is provided by the patient (i.e. Leah)," and "[t]herefore, [] the fact that Dr. Wexler met with and examined Leah, [] should not undermine the reliability of Dr. Wexler's letter or opinions set forth therein"; and

- Dr. Wexler expressed the "clear opinion that as a result of the murder of Leah's father and brother in the terrorist attack she is suffering from Post Traumatic Stress Disorder," noting the presence of "flashbacks, overstimulation, disconnections, nightmares, which *make it very difficult for the patient to persevered* [sic] *with her work* and looking after her children" (emphasis in original).

According to plaintiffs, "[a]ll of Dr. Wexler's conclusions connect Leah's mental and psychological damage, including her lack of ability to earn a living, to the murder of her father and brother."

The Special Master respectfully disagrees.

*First*, contrary to plaintiffs' insinuation, the Special Master is not questioning Dr. Wexler's competence to offer opinions within his realm of expertise. Instead, the Special Master suggests plaintiffs may have inadvertently distorted the "findings" captured in Dr. Wexler's single-page report when reaching their conclusions.

*Second*, the Special Master agrees that, "when dealing with psychological and other medical professions, a lot of the information obtained from the therapist is provided by the patient." And were Leah Tauber meeting with Dr. Wexler in a therapeutic or clinical setting rather than under the guise of Leah attempting to secure an award for financial damages, her self-serving statements might have greater objective validity. That the only "psychological report" submitted reflects a clinical visit on April 6, 2022—almost two decades after the tragic events of August 19, 2003—reinforces that view.

*Third*, the Special Master finds curious Dr. Wexler's finding, 20 years after the 2013 attack, that Leah had "a post-traumatic stress disorder following the trauma she experienced when she lost her father and brother in 2003"—trauma hallmarked by "flashbacks, over stimulation, disconnections, nightmares, which make it very difficult for the patient to persevere[] with her work and looking after her children." This curiosity stems from the fact that in his three-paragraph report, Dr. Wexler never mentions having performed any of the battery of tests recognized as authoritative when diagnosing PTSD. He neither administered the Clinician-Administered PTSD Scale for DSM-5 (CAPS-5), the PTSD Symptom Scale Interview (PSS-I and PSS-I-5), the Structured Clinical Interview; PTSD Module (SCID PTSD Module), the Davidson Trauma Scale (DTS)—tools recognized by the American Psychological Association (publishers of the Diagnostic and Statistical Manual of Mental Disorders ("DSM")) as vital when trying to diagnose PTSD. If these or similar tests were administered, the Special Master questions Dr. Wexler's decision not to include the results in his letter submitted in support of her claim.

*Fourth*, when noting Leah's "flashbacks, overstimulation, disconnections, and nightmares," Dr. Wexler does so in the context of demonstrating how these symptoms impede Leah's ability "to persevere[] with her work and look[] after her children." His almost exclusive focus on Leah's ability to "persevere with her work" in a report comprised of three short paragraphs calls into question the thoroughness, much less the objectivity, of his findings.

Plaintiffs' contention that "there is more than sufficient evidence that has been submitted to causally connect the murder of Leah's father and brother to her claimed economic damages" cannot be sustained. The Special Master finds Dr. Wexler's diminutive report void of detail, replete with the musings of a claimant seeking financial compensation, and drafted to support

those claims.  The Special Master sees no reason to revisit Leah Tauber's prayer for compensation and recommends her request for reconsideration be denied.

### MALKA CHAYA REINITZ

In the Report and Recommendation of the Special Master re: the Reinitz Plaintiffs ("Reinitz Rep."), the Special Master recommended Malka Chaya Reinitz receive economic damages of $202,856, representing $418,189 in projected net economic loss minus $226,353 in unsubstantiated therapy expenses.  Plaintiffs point out that the $226,353 deducted from the total was incorrectly expressed in New Israeli Shekels ("NIS"), not United States Dollars ("USD"). And when applying the exchange rate in use at the time, 226,353 NIS equaled $68,132.25, the final award should have correctly been stated as $350,056.75 ($418,189-$68,132.25).

The Special Master, therefore recommends Malka Chaya Reinitz be awarded Three Hundred Fifty Thousand Fifty-Six Dollars and Seventy-Five Cents. ($350,056.75.)

### ESTATE OF GOLDY ZARKOWSKY

In the Report and Recommendation of the Special Master re: the Zarkowsky Plaintiffs (Zarkowsky Rep.), the Special Master recommended awarding $778,681 in economic damages to Goldy Zarkowsky's estate, commensurate with the recommendation of the CFES report.  In its report, the CFES estimated the estate's loss to be $806,020 at the retirement age of 61.9 and $778,681 at the retirement age of 66.8.

Plaintiffs request the Special Master revisit that award and recommend Goldy's estate receive $806,020, the larger of the two estimated awards.  The Special Master agrees and recommends this court award the Estate of Goldy Zarkowsky $806,020 in compensatory damages for economic losses.

**SHRAGE ZARKOWSKY**

In the Report and Recommendation of the Special Master re: the Zarkowsky Plaintiffs (Zarkowsky Rep.), the Special Master recommended denying Shrage's request for economic loss on the grounds that the CFES loss estimates were based "on several speculative claims." These uncorroborated claims included (1) that Shrage's "insomnia" and mental state following his mother's death caused him to abandon the magazine the two had launched, (2) that the magazine "would have received annual subscriptions of $300," (3) that Shrage "could have paid [him]self a salary of $100,000" per annum "as the Editor-in-Chief," and (4) that he "would have had 'an opportunity at the school' where he was a 'head counselor of a summer program,' earning a 'nominal amount,' to 'advance in [his] position, which would have provided additional income . . . while [he] continued to promote [his] newspaper.'"

Plaintiffs ask the Special Master to revisit this denial, introducing "new evidence" in the form of a "Treatment Summary" dated March 3, 2024, prepared by Licensed Clinical Social Worker Yakov Buxbaum, who consulted with Shrage professionally for "one session" on May 12, 2023. Based on these interactions, Mr. Buxbaum concluded that "the terror attack was a significant traumatic event in Shrage's life that severely impacted his day-to-day functioning" and resulted in displays of "severe behavioral problems which materialized as angry and tearful outbursts, verbal and physical aggression, self-isolation and ostracization from peers" and "difficulty concentrating on his studies" which has "long-lasting ripple effects on his learning and earning potential." Treatment Summary at 1.

According to Mr. Buxbaum, "Shrage's symptomatic behaviors led to a diagnosis of Post-Traumatic Stress Disorder (PTSD) (F43.12) given his intrusive symptoms, negative mood, avoidance symptoms, and hyperarousal symptoms with significant reductions in quality of life

and compromised ability to function at home and in school." *Id*. He notes further that "[a] comorbid diagnosis of Social Anxiety Disorder (f 40. 1 0) was also given, due to presentations of social withdrawal and difficulty developing and maintaining relationships." *Id*. at 1–2. Mr. Buxbaum also believes Shrage "continues to present with PTSD symptoms and agoraphobia, is socially withdrawn, and is not fulfilling his potential economically." *Id*. at 2.

The Special Master finds Mr. Buxbaum's Treatment Summary does not corroborate a nexus between Shrage's deteriorating mental state and his financial decline.

As detailed in the Zarkowsky Report, Shrage's claim that his compromised mental state was a product of the August 19 Attack and resulted in lost earning capacity must be based upon a medical foundation, which, in the first instance, requires a formal diagnosis of a mental condition. Zarkowsky Rep. at 82–86. Once that psychological injury is clinically corroborated, he must also supply medical evidence that the diagnosed condition is responsible for his economic losses. The need for medical corroboration exists because causation between a diagnosed trauma and financial losses can neither be assumed nor explained absent scientific, technical, or specialized knowledge. Unlike situations where an injury and its cause are connected in some apparent way such that common experiences and observations readily explain the relationship and expert testimony is not required, the nexus between emotional trauma and financial losses is not so evident that common experiences and observations can explain the relationship to a reasonable degree of certainty. Scientific, technical, or specialized knowledge is necessary. *See Lightfoot v. Rosskopf*, 377 F. Supp. 2d 31, 33 (D.D.C. 2005) ("Under District of Columbia law, "expert testimony is generally required to prove a causal connection between an accident and an injury") (quoting *Lewis v. Washington Metropolitan Area Transit Authority*, 19 F.3d 677, 679 (D.C. Cir. 1994)). To this rule, there are three exceptions, none of which apply

here: "(1) when the injury develops within a reasonable time after the accident; (2) when causation is clearly apparent; or (3) when the cause of injury relates to matters of common experience, knowledge or observation of laypersons." *Id.*

According to Yakov Buxbaum, Shrage's emotional injuries include Post-Traumatic Stress Disorder, Social Anxiety Disorder, and agoraphobia—conditions that can manifest in countless ways depending on factors such as preconditions, the severity of the trauma, medications, therapy, and so on. The Special Master is of the view that absent an expert opinion, it is beyond the ken of an untrained fact finder to comprehend the range of Shrage reactions to these disorders and to ascertain with any certainty whether those reactions impinged on his ability to earn. As plaintiffs have put forth no evidence establishing this connection, the Special Master is constrained to recommend that Shrage Zarkowsky's request for reconsideration be denied.

Plaintiffs request, in the alternative, that the Special Master consider Yakov Buxbaum's Treatment Summary and incorporate those findings into a 25% enhancement to Shrage's recommended solatium award. The Special Master, having recommended Shrage receive solatium damages in keeping with *Heiser* and *Davis*, respectfully declines to suggest an enhancement based on findings generated 20 years after the offending incident and offered immediately after issuance of the Zarkowsky Report.

## YEHUDA ZARKOWSKY

In the Report and Recommendation of the Special Master re: the Zarkowsky Plaintiffs ("Zarkowsky Rep."), the Special Master recommended denying Yehuda's request for economic relief on the grounds that the losses estimated by the CFES were based on several abstractions untethered to any evidence, including Yehuda's (1) assertion "he was unable to find a job" or

"earn any income," as he lacked his mother's guidance and direction; (2) failure to describe his efforts to find employment or to explain why he chose not to pursue an academic degree that would have allowed him to become a teacher; and (3) belief that, but for the August 19 Attack, he would have become an educator like his mother and "likely" would have found a better-paying job in the teaching field.

Plaintiffs object to the Special Master's recommendation, referencing a letter from Wolf Sigal, LCSW, dated March 27, 2024, with whom Yehuda consulted weekly from January 2008 to October 19, 2009. According to Mr. Sigal, Yehuda's

> recurrent occupation with the traumatic event in childhood and the intense anxiety related with it, his difficulties falling asleep, strong, sudden outburst on people, and lack of interest in regular activities qualifies for a diagnosis of PTSD (309.81). In addition, his fear of and avoidance of social settings suggest an additional diagnosis of Social Anxiety Disorder (300.23). The fact that the client went to multiple therapists during the years and is still struggling demonstrates the complexity of his traumatic experience.

Sigal Let. at 2.

Plaintiffs maintain that, given Mr. Sigal's findings, Yehuda has amply demonstrated an entitlement to economic damages. The Special Master disagrees for the simple reason that, in its report dated June 17, 2022, the CFES appeared to rely heavily on the unsupported assumptions in Yehuda's Supplemental Declaration of June 7, 2021. The CFES has neither modified its report nor revised its final estimation of Yehuda's losses. Its forensic projection and plaintiffs' compensation requests rest on the same speculative assertion that led to the Special Master's rejection of this claim in the first instance.

In the alternative, plaintiffs ask that Mr. Sigal's findings regarding Yehuda's mental state be incorporated into a 25% enhancement to the $3 million baseline award recommended in *Davis*. A review of the Special Master's report reveals a recommendation that Yehuda Zarkowsky (along with Abraham Zarkowsky, Shrage Zarkowsky, Miriam Felberbaum, and

Joseph Zarkowsky) receive a solatium damages award enhanced by 35%—reflecting a 25% increase for his torment over losing both their mother and brother and a 10% enhancement for their distress over the injuries sustained by their sister—for a total of $4.05 million.  YZ-Rep. at 77.

Mr. Sigal's diagnoses, however, compels revisiting that recommendation given the Special Master's suggestions for Aharon Zarkowsky, Chaya Freisel Felberbaum, Ezriel Zarkowsky, Gittel Silber, Perl Brailofsky, and Trany Zarkowsky.  In those instances, the Special Master recommended a 60% enhancement to the $3 million *Davis* baseline, representing a 25% increase for medical corroboration of the "severe pain, grief, or suffering," a 25% increase for their torment over losing both their mother and brother, and a 10% enhancement for their distress over the injuries sustained by their sister), for a total of $4.8 million in solatium damages.  *Id*.

Given Mr. Sigal's medical corroboration of Yehuda Zarkowsky's anguish following the deaths and injuries sustained by his immediate family members, the Special Master sees no reason not to recommend a 60% enhancement to the $3 million *Davis* baseline for a total of $4.8 million.

### MENDEL ZARKOWSKY

In the Report and Recommendation of the Special Master re: the Zarkowsky Plaintiffs, ("Zarkowsky Rep.") the Special Master recommended: "Mendel Zarkowsky receive Nine Million Eight Hundred and Seventy-Five Thousand Dollars ($12,800,000) for loss of solatium." Zarkowsky Rep. at 101.  Plaintiffs correctly point out that the $12,800,000 does not correlate to the amount spelled out.  The Special Master corrects that oversight and recommends Mendel Zarkowsky receive Twelve Million Eight Hundred Thousand Dollars ($12,800,000) for loss of solatium.

## CONCLUSION

For these reasons, the Special Master recommends that plaintiffs' request for reconsideration on behalf of Shayna Applebaum Abramson, William Baxter, Hannah Litle, Noah Litle, Rivka Reinitz Wiesel, Yitzchak Reinitz, Leah Tauber, and Shrage Zarkowsky be DENIED.

The Special Master further recommends:

- Uri Horovitz be awarded Three Million One Hundred Twenty-Five Thousand Dollars ($3,125,000) in damages for loss of solatium;

- Zvi Horovitz be awarded Two Million Six Hundred Ninety Thousand Eight Hundred Eighty-One Dollars ($2,690,881) in economic damages;

- Yaacov Reinitz be awarded One Million One Hundred Seventy-Eight Thousand Three Hundred Forty-Two Dollars ($1,178,342) in economic damages;

- Malka Chaya Reinitz be awarded Three Hundred Fifty Thousand Fifty-Six Dollars and Seventy-Five Cents ($350,056.75) in economic damages;

- the Estate of Goldy Zarkowsky be awarded Eight Hundred Six Thousand Twenty Dollars ($806,020) in economic damages;

- Yehuda Zarkowsky be awarded Four Million Eight Hundred Thousand Dollars ($4,800,000) in damages for loss of solatium; and

- Mendel Zarkowsky be awarded Twelve Million Eight Hundred Thousand Dollars ($12,800,000) in damages for loss of solatium.

Dated: April 30, 2025                          Respectfully submitted,

                                              /s/ Alan L. Balaran,
                                              Alan L. Balaran, Esq.
                                              Special Master